NATIONAL LABOR RELATIONS BOARD
v. INDIANA DESK CO.
No. 8711.

Circuit Court of Appeals, Seventh Circuit.
June 15, 1945.

Alvin J. Rockwell and Malcolm F. Halliday, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and Jack G. Evans, National Labor Relations Board, of Chicago, Ill., for petitioner.

Isidor Kahn and William F. Little, both of Evansville, Ind., for respondent.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This case is here upon petition of the National Labor Relations Board, pursuant to Sec. 10(e) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued against respondent on April 29, 1944, following the usual proceedings under Sec. 10, 29 U.S.C.A. § 160, of the Act.

The Board's order is based upon findings that respondent has engaged and is engaging in unfair labor practices affecting commerce, within the meaning of Sec. 2(6) and (7) of the Act. The unfair labor practices charged and found are that re-spondent (1) violated Sec. 8(3) of the Act by discriminating against a number of its employees because of their participation in a strike, and (2) interfered with, restrained and coerced its employees in the exercise of rights guaranteed in Sec. 7 of the Act, in violation of Sec. 8(1), by threats that employees who had engaged in the strike would be denied further employment in the community and other statements calculated to discourage membership in the union. The union referred to is the charging union, the United Furniture Workers of America, Local No. 331, affiliated with the C. I. O. The contested issues in the main are (1) whether the findings as to the unfair labor practices are supported by substantial evidence, and (2) even so, whether such findings support the Board's conclusions of law that the Act has been violated as charged.

We shall first consider the situation as it pertains to the alleged violation of Sec. 8 (3). In view of the contentions advanced by respondent, it seems appropriate to consider the evidence with reference to two events, (1) that of the strike and (2) that pertaining to respondent's refusal to recognize the strikers as employees at the termination of the strike.

Respondent contends that because of the nature of the strike it had a right to discharge those who participated therein. The strike occurred on October 9, 1942, at respondent's plant located at Jasper, Indiana. Respondent, as its name indicates, was and is engaged in the manufacture of furniture, partly (the record does not show to what extent) for use of the government in its war activities. It is pertinent to note that the record is silent as to any anti-union background or activity on the part of respondent. In fact, there is no evidence of any organizational activity on behalf of any union either at the time of or prior to the strike. There is evidence that some few of the strikers, perhaps not more than three, were affiliated with the union.

Some time before nine o'clock on the morning of October 9, 1942, a group of 23 employees who worked in the lower machine room went to the office of superintendent Krodel and requested a wage increase. Krodel, after conferring with respondent's general manager, told the group that their demand could not be granted and that they must either return to work or

punch out. This group thereupon punched out and left the premises.

About ten o'clock, 14 employees from the upper mill room punched out and also left the premises. This group so acted without talking to any representative of management, without warning of any kind, without having made any demand for a pay increase or any other change in the condition of their employment. Fourteen employees in the finishing room failed to return to work after the noon hour lunch. These, too, gave no explanation and made no previous demands on management. It appears that the latter two groups struck in sympathy after learning of the strike by the first group. Thus, 51 of respondent's 135 employees participated in the strike.

The Board found that these 51 employees "went out on strike because of a wage dispute." As to what happened on the evening of the strike, the Board found:

"That evening the strikers attended a meeting of the Union and those strikers who were not already union members then joined. At the meeting, the Union formally called a strike and decided to picket the respondent's plant and to request of the respondent wage increases for the employees and recognition of the Union as exclusive bargaining representative. * * * At the outset of the strike, the respondent handed each striker, except George Gardner, an individual separation report, stating that he had 'voluntarily' left the respondent's employ 'without good cause,' and the respondent paid each striker his accrued wages."

The finding thus made is substantially accurate although there is no proof that all the strikers attended or joined the union meeting. It is also pertinent to keep in mind that the union did not at any time represent a majority of respondent's employees.[1]

The Board's finding regarding the "individual separation report" handed to each of the strikers is correct but needs some amplification. October 9, the date of the strike, was on Friday. Respondent's pay week ended on Thursday, and for such week its employees were paid on each following Saturday. Thus, on Saturday, October 10, each employee was entitled to his wages for the week ending Thursday, October 8. On Saturday, the two groups of employees who struck in the morning of October 9 were paid their wages for the week ending the preceding Thursday and also what they had earned on Friday prior to the time they quit. Those who did not return to work on the afternoon of October 9 were not paid the amount they had earned on the morning of October 9, as respondent did not know whether their absence was due to having joined the strike or to other conditions.

Those who struck on the morning of October 9 were handed separation reports in connection with their pay checks, stating that they had voluntarily quit and left respondent's employ without good cause. These reports were given in accordance with the requirements of the Indiana Unemployment Compensation Act. Burns' Ann.St. § 52-1501 et seq. The group which quit on the afternoon of October 9 were not given such separation reports at the time they were paid on the 10th, as respondent did not know what they intended to do. On October 10, all employees, except those who had struck on the morning of October 9, were given a notice calling attention to the President's Executive Order of September 15, 1942, and stating, "Therefore, it is illegal to increase wages at this time without permission of the National War Labor Board." Also, on the same date, the group which did not return to work on the afternoon of October 9 were handed a notice which stated in effect that unless they returned to work at the regular time on Monday morning, October 12, respondent would conclude that they had voluntarily left its employ without good cause. When they failed to return to work on October 12, respondent delivered to each of them as separation report with pay for the time they worked on the morning of October 9.

The Board did not find, in fact there is no intimation, that respondent committed an unfair labor practice either on October 9 or theretofore. It does find, as already noted, that the 51 strikers ceased work as a result of a "wage dispute." It follows, so the Board argues, that they remained employees entitled to the protection of the Act. On the other hand, respondent contends that the strike on October 9 was instituted

[1] In fact, an election held shortly subsequent to the events involved in the unfair labor practice case disclosed a majority opposed to the union.

and prosecuted in order to compel respondent to violate the Act of October 2, 1942, and Executive Orders No. 9250 and No. 9017, 50 U.S.C.A.Appendix, §§ 901 note, 1507 note. The contention follows that the strike was illegal, or at any rate its purpose was illegal, and that respondent had a right to sever the employer-employee relationship with those who participated therein.

Sec. 5 of the Act of 1942, Sec. 965, Title 50 U.S.C.A.Appendix, known as the Stabilization Act, provides:

"No employer shall pay, and no employee shall receive, wages or salaries in contravention of the regulations promulgated by the President under this Act."

Sec. 11 of the Stabilization Act, Sec. 971, Title 50 U.S.C.A.Appendix provides:

"Any individual, corporation, partnership, or association willfully violating any provision of this Act, or any regulation promulgated thereunder, shall, upon conviction thereof, be subject to a fine of not more than $1,000, or to imprisonment for not more than one year, or to both such fine and imprisonment."

Executive Order No. 9250 (Secs. 1 and 2 of Title II) provides:

"No increases in wage rates, granted as a result of voluntary agreement, collective bargaining, * * * shall be authorized unless notice of such increases * * * shall have been filed with the National War Labor Board, and unless the National War Labor Board has approved such increases * * *."

Sec. 2 of the Order precludes an approval of an increase in wages by the War Labor Board except under certain conditions therein enumerated.

Sec. 2 of the National Labor Relations Act provides:

"The term 'employee' shall include * * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice * * *."

There is presented the interesting and perplexing question as to whether the striking employees quit work as the result of a "labor dispute" within the meaning of the Act. Ordinarily, of course, a controversy concerning wages would involve a labor dispute. Also, ordinarily a dispute, labor or otherwise, is something capable of adjustment by the parties. In the instant situation, however, it was not within the power of the strikers and respondent to settle or adjust that which is claimed as a "labor dispute." In fact, by a positive provision of law they were precluded from so doing. It hardly seems reasonable to think that a "labor dispute" was intended to include a dispute the settlement of which would have violated a statutory provision. The question, as far as we are advised, has not been decided. In our judgment, however, the unconditional demand for an increase in wages did not give rise to a "labor dispute" as that term is used in the Act.

But whether or not the strike was the result of a "labor dispute," respondent makes a plausible contention that the purpose of the strike was illegal and that the strikers were no longer entitled to the protection of the Act; in other words, that respondent was no longer obligated to treat them as employees. Again, this precise question, so far as we know, has not been decided by a court. In the Matter of the American News Co., Inc., 55 N.L.R.B. 1302 (called the News case), is strongly relied upon by respondent in support of its contention. The facts of that case are quite similar to those of the instant case, and there the Board dismissed the complaint. In the instant case, the Board does not retract the legal principles enunciated in that case but seeks to distinguish this case on the facts. Under these circumstances, it seems worth while to analyze the News case in some detail.

There, the employees were represented by a union recognized by the employer as the bargaining agent. The union had bargained with the employer and an agreement was reached as to an increase in wages, subject to the approval of the War Labor Board. Application was made to that Board for such approval, upon which no action had been taken. During such period, the union members held a meeting on June 10, 1943, and decided to strike unless the employer granted the proposed increase. Therefore, the dispute between the union and the employer related to the latter's refusal to grant an increase prior to the required approval. On June 11, the men struck. Thereupon the employer sent each striker a check in payment for his services to date, with a notice of a termination of such services as of the date

of the strike. On June 21, the strikers requested reinstatement, which was refused by the employer, not because their places had been filled prior to June 21 but for the reason that the strike was illegal and their relation as employees was thereby terminated. Thus the issue as to whether the employer had the right to discharge the strikers is precisely the same as that of the instant case.

The Board prefaces its legal discussion with the observation, "A critical fact which shapes our consideration of the case is that the strike was neither provoked nor preceded by unfair labor practices." This same observation is applicable to the instant case. The Board states:

"The fact is that the strike was called to compel the employer to grant the wage increases prior to the approval of the National War Labor Board, and it is unchallenged before us that such action on the part of the employer would have brought down the criminal penalties provided by the wage stabilization legislation of October 2, 1942."

The Board adds in a footnote:

"Indeed, the men could not have received the wage increases without themselves violating the law. Section 5(a), Act of October 2, 1942."

The Board, after quoting Sec. 11 of the Act and Sec. 1, Title II of the Executive Order of October 3, 1942, states:

"The passage of these measures was brought about to curb an inflationary spiral which threatened the value of our currency and the ability of the nation to prosecute the war. The formulation and the proper administration of these statutes have been the constant concern of Congress and the President."

The Board states:

"The Act was addressed to employer, not employee, misconduct. But this does not mean, and never has meant, that employee misconduct is necessarily irrelevant to the determination of violations of Section 8."

A number of cases are cited wherein it has been held that fraud and violence on the part of employees places them outside the protection of Sec. 8(1) and (3) of the Statute. The Board proceeds:

"Nor, we are forewarned, is relevant misconduct on the part of employees limited to fraud or violence. In two cases where the misconduct was untainted by either the Supreme Court nevertheless held the concerted activities outside the protection of the Act. Southern Steamship Co. v. N. L. R. B., 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1248 (strike in violation of the federal mutiny statute); N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682, (concerted action to compel employer to accept modification of existing contract)."

In a footnote the Board adds:

"In one important respect the employees in the Fansteel and Southern Steamship cases stood in a much more favorable light than the employees in the instant case, since there, unlike the situation here, the strikes were provoked by flagrant unfair labor practices."

The Board concluded:

"* * * that a strike prosecuted in order to compel an employer to violate the Act of October 2, 1942, is not within the concerted activities protected by Section 7."

The Board in the instant case, in distinguishing the News case on the facts, states:

"In the American News case, the union and the employer had bargained to an agreement for wage increases and, in accordance with applicable federal regulations, had made a joint application to the National War Labor Board for approval of the proposed increases. Before such approval had been obtained * * * the union resorted to strike action to force the employer to pay the proposed wage increases immediately. * * *

"However, in the present case the strike had no such illegal purpose. The record shows that the strike here, unlike that in the American News case, was the outgrowth of a wage dispute provoked by the respondent's unwillingness to agree to the employees' request for wage increases and was not precipitated by an unlawful demand that agreed wage increases be put into effect prior to approval by the War Labor Board. In essence, the instant case involves a situation in which, after reaching an impasse in bargaining negotiations concerning wages, employees have resorted to economic pressure to effect an agreement with their employer."

We think that the Board's reasoning in the News case is sound and that it is equal-

ly applicable to the instant situation. The difference in the facts cannot affect the principle involved. At any rate, we are unable to discern what difference it makes whether the pressure placed upon the employer is exerted before he agrees to an increase in wages or afterwards. In one instance as much as in the other, his compliance with the demand of the employees without authority of the War Labor Board is a violation of the statute.

In the News case the employer was confronted with the properly designated bargaining agent of its employees, and under Sec. 9(a) of the National Labor Relations Act was obligated to bargain. In the instant stituation, the striking employees while acting in a group were not the representative of respondent's employees for the purpose of bargaining, and respondent was under no obligation to bargain. N. L. R. B. v. Draper Corporation, 4 Cir., 145 F.2d 199, 203, and cases therein cited. The only right of the employees in the instant case is found in 9(a) as follows:

"That any individual employee or group of employees shall have the right at any time to present grievances to their employer."

This provision, however, imposed no obligation upon respondent to bargain with the employees. At any rate, a refusal to bargain under such circumstances is not an unfair labor practice and it is not contended otherwise by the Board.

Notwithstanding this situation, the Board seeks to distinguish the instant case from the News case on the theory that the parties had reached "an impasse in bargaining negotiations concerning wages." It is difficult to see how an "impasse" could have been reached concerning a matter about which respondent was not obligated to act. Therefore, the fact is that respondent in the instant case did all that was required of it by the Act just as much as did the employer in the News case. We are convinced that a strike under one situation was tainted with an illegal purpose just as much as it was under the other. In the instant case, the strike was precipitated by an unconditional demand which respondent not only had no authority to grant but concerning which it was under no obligation to bargain.

We think this conclusion finds support in N. L. R. B. v. Draper Corporation, supra. True, in that case the union had been designated as the bargaining agent of the employees. A minority group became dissatisfied with the bargaining negotiations, and, as stated in the opinion, "considered that the company was 'stalling' and that they wanted 'action' and would get it." They were told by management "either to go to work or get . out of the plant." Thereupon they struck. The next day they were paid up to date and discharged. At the conclusion of the strike, the strikers requested reinstatement. The court refused to enforce an order of the Board which required reinstatement with back pay. In that case, as here, it was the position of the Board that the strikers engaged in concerted activities, for the purpose of collective bargaining or other mutual aid or protection within the meaning of Sec. 7 of the Act. It was also argued that the discharge and refusal to reemploy constituted "discrimination in regard to hire and tenure of employment within Sec. 8 (3) of the Act."

The court, in deciding adversely to the Board's contention, on page 203 of 145 F. 2d stated:

"The proviso to section 9 above quoted, preserving to individuals or groups of employees the right to present grievances to the employer, negatives by necessary inference the right on their part to call strikes for the purpose of influencing the bargaining being carried on by the chosen representatives of all the employees."

On the following page, the court made this pertinent observation:

"Just as the employer, if he refused to bargain with the representative of a majority of a proper unit, acts at his peril; so a minority of the employes, who strike because the employer refuses to bargain with their representative, do so at their peril in so far as compulsory reinstatement is concerned."

It is true, as noted, that in the Draper case as well as in the News case, supra, the employees were represented by a duly authorized bargaining agent. To that extent, the facts of those cases are distinguishable from those of the instant case; however, we are of the view that such difference in the facts does not alter the applicable principle. In either event, a minority group is authorized to present grievances, but in neither event is the employer obligated to bargain. Such was the reasoning in N. L. R. B. v. Brashear Freight Lines, 8 Cir., 119 F.2d 379. There,

as in the instant case, a minority of the employees were members of a union. The union sought to bargain with the employer concerning a work agreement. In the language of the court (page 382), "When it became evident to the representative that no meeting would materialize, he gave a signal to the men in the shop and most of those in the Union went out on strike at once and began picketing the plant." The court, after observing that the sole reason for the strike was the employer's failure to bargain with a representative of the minority, on page 382 stated:

"There was no legal obligation to bargain with this representative of a minority. * * * so a minority of the employes, who strike because the employer refuses to bargain with their representative, do so at their peril in so far as compulsory reinstatement is concerned."

Of course, respondent upon presentation of the demand for an increase in wages, could have promised, had it so desired, to take the matter up with the War Labor Board, but it was under no obligation to so do any more than it was under obligation to bargain. Furthermore, respondent was not presented with such a request; the demand was for a present increase. The purpose of the strike undoubtedly was to force compliance with such demand. To show that the unconditional demand for an increase in wages, as well as the strike for the purpose of forcing compliance with such demand, was a violation of the Emergency Price Control Act, it is only necessary to visualize the situation had the demand been complied with or the purpose of the strike accomplished. It is hardly open to doubt but that under such circumstances respondent, as well as the employees, would have violated the Price Control Act.

■ Assuming, however, contrary to what we have decided, that the purpose of the strike was lawful, we now consider the manner in which the strike was conducted. As already noted, it was decided at a meeting of the union held on the evening of October 9 to picket respondent's plant, request wage increases and a recognition of the union as the bargaining representative. The record is silent as to whether this action was communicated to respondent, but even so respondent was under no obligation to bargain with the union as it did not represent or claim to represent a majority of respondent's employees.

On the morning following the strike, the picketing of respondent's plant commenced. As to this picketing, the Board found:

"As a result of the establishment of a picket line by the union, approximately 85 non-strikers did not enter the plant; normal operations at the plant ceased on October 10, 1942, and were not resumed until after the strike was abandoned about November 1, 1942. * * * Despite efforts of State and Federal labor conciliating agencies, the strike, accompanied by picketing, continued until about October 30, 1942. On that day the non-strikers passed through the picket line; the respondent reopened its plant and began to return non-strikers to work without change in their status."

The intermediate report of the trial examiner is somewhat more enlightening than the findings of the Board. In this report it is stated:

"The next morning pickets guarded each entrance to the plant and continued to do so during the strike. Until the latter part of the strike the pickets succeeded in keeping the approximately 85 non-striking employees from entering the plant, but they permitted access to the plant to officials, foremen and clerical employees. As a result, normal operations of the plant ceased. However, as Saturday October 10 and October 17 were regular pay days the employees were permitted to go through the picket line one at a time to get their pay checks."

The report of the examiner throws further light upon the manner of the picketing by stating:

"During the strike, the technique employed by the pickets was to walk in a compact circle immediately in front of the plant entrances. This tactic proved effective in keeping the non-striking employees out of the factory * * *."

The examiner, in describing the manner in which the non-striking employees finally gained entrance to the plant, states:

"They marched in twos down the sidewalk to the factory. As they came to the employees' entrance the three deputies who were between the circulating pickets and the entrance, broke through the picket line from the inside, and the non-strikers charged the picket line from the outside. This planned maneuver caused violent confusion, shouting and some fighting, but it

temporarily broke the picket line and the non-strikers entered the factory."

A reading of the testimony is still more illuminating as to the "technique" employed.[2] The entrance to the plant ordinarily used by the employees and known as the employees' entrance was a door 3 or 3½ feet wide. The sidewalk was immediately adjacent to that side of the building. In other words, a person entering at this point stepped directly from the sidewalk into the door. As stated by the examiner, the picketers operated in a circle. There were usually 40 or 50 of them, and they operated so near to the entrance door that there was no room for a person to enter.

Respondent contends that its plant was in effect and effectually taken over by the forceful picketing operations of the strikers, and respondent was therefore prevented from conducting any operations in its plant from October 9, 1942 until October 30, 1942. In response to this contention, the Board in its brief states:

"It should be noted at the outset that the strike was not initiated or accompanied by a seizure of respondent's property, and that at no time did the strikers even attempt to take physical possession of the

---

[2] The witness Sendelwick testified:

"Q. Now, describe to me the manner in which the picketing was conducted. You testified they marched in a circle, is that correct? A. Yes, sir.

"Q. Were you moving all of the time? A. Yes, sir.

"Q. How close behind you was the next picket? A. Just as close as he could get.

"Q. And how far in front of you was the picket in front of you? A. As close as he could get."

"Q. On that second morning when they tried to get through, did you and your fellows with you there, men on the picket line, use force to try to keep them out? A. Yes, sir.

"Q. What about people trying to come into work? Did you push them back? A. We tried to keep them back.

"Q. I am talking about you, personally. Did you push them back? A. Some of them."

The witness Wiseman testified:

"Q. You and your group had the entrance blocked off, did you? A. We were on the sidewalk.

"Q. You had the entrance blocked off to keep people from getting through? That was the purpose of the picket line? A. Yes, sir.

"Q. And some of these folks tried to get through the picket line and into the entrances to go to work? A. Yes sir."

"Q. How many others were in the circle? A. I judge forty. Somewhere around forty.

"Q. And how many men were trying to get in? A. Fifty, I imagine, fifty or sixty."

The witness Kreilein testified:

"Q. You said at least upon one occasion the Deputies engaged in some kind of activities. A. The men came close and they tried to get us away from the wall.

"Q. Who tried to get you away? A. The Deputies.

"Q. What did they do? A. Pushed us away from the wall so that the men who wanted to go to work could get in.

"Q. From time to time there were other men trying to go to work for the last two or three days of the strike, weren't there? A. Sure.

"Q. And the picket line refused to let them through, is that right? A. Yes, sir."

The witness Ackerman testified:

"Q. And the people tried to get through, you kept them from getting through, didn't you? A. Yes, sir, to picket the plant."

"Q. When the fellows tried to go through, what did you do? A. Just kept them from going through.

"Q. What did you do to keep them from going through? A. Just broke them up.

"Q. When they tried to run past you, what did you do? A. Blocked them off."

"Q. Did you use physical force to keep them from getting through if they tried to get through? A. Yes, we did, some.

"Q. You were around the various entrances and doors to the plant? A. Yes, sir.

"Q. How many entrances are there? A. Four or five, I can't recall.

"Q. Did you divide your group so that there would be some at each entrance? A. Yes, sir.

"Q. Or just block off the sidewalk leading up to the plant all around? A. We had them all around the factory.

"Q. All around the factory, but more at the employees' entrances? A. Yes, sir.

"Q. Somebody tried to go through with force, you kept them from going through? A. Yes, sir.

"Q. Did you use that force day after day to keep them from going through? A. Certainly."

plant and its equipment. The picketing, marked by some shoving and pushing between the strikers and those who desired to cross the picket line, was conducted with far less disorder than that which the courts have acknowledged as normal and reasonable for a picket line. (Citing cases.)"

We need not discuss the cases cited in support of this contention. It is sufficient that we have examined them and conclude they are without application. None of them, in fact no court so far as we are aware, has considered a factual situation such as is here presented.

The undisputed evidence discloses that the picketing was not conducted for the purpose of publicizing the strike or any grievance which the strikers had against respondent, or for the purpose of persuading the non-strikers to join the strikers or to refrain from going to work during the strike. It it equally undisputed that the picketing was designed and maintained for the avowed purpose of forcibly excluding any and all employees from entering respondent's plant, and that the picketers were prepared to use any force necessary to accomplish such purpose. As stated by the trial examiner, the "technique employed * * proved effective in keeping the non-striking employees out of the factory." The firm grip which the picketers had on the situation is shown by the report of the trial examiner that "they permitted access to the plant to officials, foremen and clerical employees," and that on pay days "the employees were permitted to go through the picket line one at a time to get their pay checks."

■ There is not a scintilla of evidence to support the Board's argument that any fracas was provoked by respondent's foremen or by the non-strikers, other than what was occasioned by the attempt of the non-strikers to return to their jobs. This they had the undoubted right to do. Moreover, the non-strikers did not undertake to break through the picket line until after they had been unlawfully and by force excluded from their place of employment for some three weeks. We do not regard it as material that the non-strikers waited three weeks before attempting forcibly to vindicate their rights. Neither do we think, as the Board seems to imply, that the misconduct of the picketers should be measured by the amount of violence which occurred. The fact that greater violence did not take place was due solely to the forbearance exhibited by respondent, and especially by the non-strikers. In other words, it was their reluctance to accept the challenge to engage in a pitched battle with forty or fifty men which in all probability saved the situation from much violence and bloodshed.

■ We think this strike was unlawful from its inception, but whether so or not we are of the opinion that the picketing was unlawfully conducted. The result accomplished, intentionally and designedly, was no different than if the strikers had bolted the entrance doors to respondent's plant. We are of the view that such a situation is no different than that considered in cases where the employer's right of possession and enjoyment of its property had been interfered with by "sitdown" and other similar forms of strikes. As a result of the strikers' misconduct, respondent was forced to close its plant, and its non-striking employees who desired to work were prevented from so doing. As stated by the examiner, "Until the latter part of the strike the pickets succeeded in keeping the approximately 85 non-striking employees from entering the plant * * *. As a result, normal operations of the plant ceased." While the legal situation may not be affected, yet we think it is pertinent to observe that this all happened in time of a national emergency when the policy of the government embraced by industry and labor leaders alike is opposed to strikes.

■ We therefore conclude that there is no substantial support for the Board's finding that respondent has committed any unfair labor practices within the provisions of Sec. 8(3) of the Act. Furthermore, we are of the view that the affirmative requirements of the Board's order, predicated upon such violation, will not "effectuate the policies of the Act."

■ To hold that the striking employees in this case are entitled to be reinstated, some of them with back pay, is to put a premium upon their misconduct and to encourage like conduct on the part of others. How such action can effectuate the policies of the Act is beyond our comprehension. In N. L. R. B. v. Fansteel Corporation, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, the court, after disposing of the situation as to the "sitdown" strikers, considered that concerning

17 strikers who operated outside the plant as aiders and abettors. Concerning them, the court on page 260 of 306 U.S., on page 498 of 59 S.Ct., 83 L.Ed. 627, 123 A.L.R. 599, stated:

"If it be assumed that by virtue of § 2(3) they still had the status of 'employees', that provision did not automatically provide reinstatement. Whether the Board could order it must turn on the application of the provision empowering the Board to require 'such affirmative action, including reinstatement of employees' as will 'effectuate the policies' of the Act."

After concluding that the aiders and abettors were in no different situation than the "sit-down" strikers themselves, the court stated:

"We find no ground for concluding that there is any policy of the Act which justifies the Board in ordering reinstatement in such circumstances."

The Board found that "the respondent interfered with, restrained, and coerced its employees, within the meaning of Sec. 8(1) of the Act" because of certain anti-union statements made by supervisory officials. The Board makes no contention that the discriminatory statements relied upon to show a violation of 8(1) affords any support to its finding that 8(3) was violated. In fact, the Board in its decision treats the 8(1) violation as separate and distinct from the 8(3) violation. For this reason, we have purposely considered and decided the case pertaining to the 8(3) violation, including that part of the order relating thereto, prior to a consideration of the 8(1) violation.

Statements made by respondent's supervisory employees, relied upon by the Board as discriminatory and therefore in violation of 8(1) were made either during the latter part of the strike or subsequent to its termination. Near the end of the strike, superintendent Krodel referred to Fulford (the union organizer) as an agitator responsible for the trouble. Foreman Revard Pfeffer also during the course of the strike referred to Fulford in a similar vein. After the termination of the strike, foreman Alois Pfeffer made a statement to the effect that the C. I. O., if it got started in Jasper, would make it a ghost town, and he also stated to an employee subsequent to the strike, "You will never get a job in this town any more." Also, just prior to the election held on November 21, 1942 (the strike ended October 30, 1942), vice president Seng stated to one of the strikers who had been reemployed, "Vote the way you want to vote, but they will treat you right out there, I will see to that. I am for an increase of wages myself but I am against the checkout." None of these statements attributed to respondent's foremen were denied.

Respondent argues that none of the statements were coercive, that they were merely isolated statements, and that they do not constitute substantial evidence in support of the Board's finding, especially in view of the fact that there was no proof that respondent had discriminated against the union or its employees prior to the strike. Respondent's contention must be rejected. The fact that it considered the strike as illegal did not justify discrimination against the union or its employees either during the strike or subsequent thereto. The Board has found that the remarks and statements made were discriminatory. Such finding is supported by substantial evidence and must be accepted.

The Board's petition for enforcement of its order as presented is denied. An order for enforcement in conformity with this opinion, that is, one predicated upon the 8(1) violation is allowed.