Robert E. CLUNE et al., Plaintiffs,

v.

PUBLISHERS' ASSOCIATION OF NEW YORK CITY et al., Defendants.

United States District Court
S. D. New York.
Feb. 6, 1963.

Affirmed 314 F.2d 343.

Harold, Luca, Persky & Mozer, New York City, for plaintiffs; John R. Harold, New York City, of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendants; John R. Schoemer, Jr., Philip D. Pakula, New York City, L. W. Hansen, of counsel.

Lord, Day & Lord, New York City, of counsel, for New York Times.

McCauley, Henry & Brennan, New York City, of counsel, for Journal American and Mirror.

Javits, Trubin, Sillcocks, Edelman & Purcell, New York City, of counsel, for Herald Tribune.

Drechsler & Leff, New York City, of counsel, for New York Post.

Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel, for World-Telegram & Sun.

Goldman, Evans & Goldman, New York City, of counsel, for Long Island Daily Press & Star Journal.

LEVET, District Judge.

This suit grows out of the present dispute in the New York City newspaper industry as a result of which certain newspapers have not been published since December 8, 1962. Plaintiffs sue under Sections 1, 15 and 26 of the Sherman Act (15 U.S.C. § 1 et seq.) for injunctive relief and treble damages allegedly resulting from the making and execution by defendant publishers of an agreement to cease publication while any of their number is prevented by a strike from publishing its own newspaper. The plaintiffs, newspaper employees, seek a preliminary injunction against the continued execution of that agreement by defendants.

I find the following facts for the present purposes:

### FINDINGS OF FACT

1. Plaintiffs are all printing pressmen who were within the employ of certain of the defendant newspaper publishers prior to December 8, 1962.[1]

2. Plaintiffs purport to bring this action on behalf of themselves and of all others similarly situated as printing pressmen, as a class action within the meaning of Rule 23(a) (2) and (3) of the Federal Rules of Civil Procedure.

3. The defendant corporations are publishers of daily newspapers in the City of New York engaged in interstate commerce. These corporations and the newspapers published by each are as follows:

News Syndicate Co. Inc.—Daily News

The New York Times Company—The New York Times

New York Herald Tribune, Inc.—New York Herald Tribune

Hearst Corp.—New York Mirror

Hearst Consolidated Publications, Inc.—New York Journal American

Newspaper Enterprises, Inc.—Long Island Star Journal

New York World Telegram Corporation—New York World Telegram & Sun

Long Island Daily Press Publishing Company, Incorporated (sued as

---

1. The plaintiffs and their respective newspapers are as follows:

| | |
|---|---|
| Grant, Sheehan, Travers | Daily News |
| Kennedy | Mirror |
| Canal | Herald Tribune |
| Collins | Post |
| Grosso | Journal American |
| Albin | Times |
| Smollen | Long Island Press |
| Jaeger | World Telegram |
| Slavin | Long Island Star Journal |

Plaintiffs Clune and McFadden are employees of the Daily News, although, in view of their union offices, were not working as pressmen immediately prior to December 8, 1962. Their seniority at the newspaper is protected by agreement.

Long Island Daily Press)—Long Island Daily Press

New York Post Corporation—New York Post.

4. The defendant Publishers' Association of New York City (Publishers' Association) is an unincorporated membership association whose membership includes the defendant newspaper publishing corporations.

5. Although not so specified in the complaint, plaintiff Clune is President and plaintiff McFadden, Secretary-Treasurer of New York Newspaper Printing Pressmen's Union Number Two. Certain other plaintiffs are said to be "chapel chairmen" or "shop stewards" at various newspaper plants of defendants.

6. In the New York City newspaper industry, there are nine craft unions which represent employees in the production and delivery departments of the newspapers and which enter into industry-wide contracts with defendant Publishers' Association. These crafts are the printers or typographers (who are now on strike), the pressmen (of whom the present plaintiffs are members), the deliverers, the stereotypers, the photoengravers, the paper handlers, the mailers, the electricians and the machinists.

7. It has been the practice for many years for the Publishers' Association to act as agent for its newspaper members in the negotiation and administration of collective bargaining agreements with these nine craft unions. Each agreement covers an industry-wide bargaining unit. Similar agreements in other industries are common. See, e. g., N. L. R. B. v. Truck Drivers Local Union 449, 353 U.S. 87, 94–95, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). The plaintiffs as members of the Pressmen's Union work under a collective bargaining agreement entered into by the Publishers' Association and the defendant newspaper publishers and the Pressmen's Union.

8. The contracts between the nine craft unions and the Publishers' Association, as agent of the defendant newspaper publishers, had a uniform expiration date of midnight, December 7, 1962. For some time prior to that date, Bertram A. Powers, President of the Typographical Union, had announced to his membership and to the public that there was a distinct possibility of a long strike by his union against the newspapers. He stated that his union was unwilling to accept the $8.50 weekly settlement reached by the publishers with the Newspaper Guild. The Typographical Union called a strike to commence at 2:00 A.M. on December 8, 1962. Fifteen minutes before this deadline the union committee submitted to the publishers new contract demands, which were unacceptable to the newspaper defendants.

9. On December 8, 1962, after negotiations failed to produce a settlement, Local 6 of the International Typographical Union announced it would strike the News, the Times, the Journal American and the World Telegram. It did not strike the Herald Tribune, the Mirror, the Post or either of the Long Island newspapers, the Star Journal or the Daily Press. No peculiar facts concerning the Typographical Union's relations with any single employer appear. The only reason for the strike against the News, the Times, the Journal American and the World Telegram was the failure of the publishers to meet the Union's demands.

10. Within fifteen minutes after the Typographical Union announced its decision to strike certain papers, a representative of each newspaper that had not been struck, speaking separately and for only that paper, but in the presence of all the others, announced that it would and did in fact suspend publication at once.

11. The decision to suspend publication was pursuant to an agreement among the publishers entered into on or about May 1, 1962. The substance of this agreement was that if any of the defendants were struck by any of the craft unions having a collective bargaining agreement with any of the defendants, each of the other defendants would cease publication.

12. On December 8, 1962, when the strike of the New York Typographical Union Number Six began, the pressmen refused to go to work at the struck newspapers. They were, however, willing to work at the non-struck papers.

13. The reasons ascribed by defendants for the union's separate treatment of the newspapers and the publishers' reasons for their own reaction were set forth by Walter Thayer of the Herald Tribune before the "Board of Accountability" on January 9, 1963, as follows:

"As we see it, there were three reasons the printers followed this pattern. First, a strike against four papers only would prevent a newspaper blackout, if the non-struck papers continued to publish.

"On the surface the selection looked like a fair choice. Two morning papers, one tabloid and one standard size, would publish; one afternoon paper would be in business. This seems rather commendable.

"Under the same heading, however, I would suspect that the printers concluded that as they intended this to be a long strike—they had said so—there would be less public demand and therefore less public pressure for a settlement if three papers were serving the newspaper requirements of New York rather than none.

"For example, perhaps the Mayor, the Governor, and the Secretary of Labor would not have become so interested if three papers were publishing, and perhaps even this Board might not have come into existence.

"The second reason, as we see it, is that the pressure to yield to unreasonable or onerous demands are geometrically increased if a union is in a position to negotiate with four papers which are closed while three of their competitors are publishing and reaping the benefits which accrue under these circumstances.

"The newspaper industry is a peculiar industry. One thing a newspaper or even four strong newspapers together cannot long withstand is to be out of business while their competitors are in business. Readers and advertisers are not fickle, but their demand is a constant one, a daily one and they are susceptible, and to each paper they are precious commodities.

"Therefore, if the Herald Tribune and the Mirror and the Post were to continue to publish while the other four papers were struck, the willingness of those four papers to accede to unreasonable or onerous demands would be very great, and we have no illusion whatsoever that we who published under these circumstances would not be the subject to the same terms after the others had settled or alternatively would be struck while they published.

"As recently as the Guild strike when the Daily News alone was struck, there was a public statement by an official of that union to the effect that when the News had settled, the same settlement and the same terms would be imposed on the other papers and that the order for that purpose had been established— a rather chilling prospect.

"There's a third reason we ascribe to this strategy by the union. It's not coincidence, I believe, that the non-struck papers, so to speak, the Tribune, the Mirror and the Post, are the papers which are popularly regarded as the ones least likely to survive a strike."

14. The defendants' activities have an effect on interstate commerce. The daily newspapers published by defendants constituted a substantial portion of the daily newspapers published in the United States; their consumption of newsprint is likewise large; various industries and businesses are affected; wage losses are large and other effects are apparent.

## DISCUSSION

Defense counsel in their brief before this court state:

"For purposes of the present motion, the generalized statement in the complaint of the allegedly illegal agreement among defendants will be accepted as true, although defendants would certainly not admit any agreement or concerted action in the terms there pleaded." (p. 2)

The court will so consider this in determining this motion for preliminary injunction since it must be kept in mind that the sole issue is the immediate one of the issue or not of such a preliminary injunction.

The plaintiffs' contentions are clear, to wit, that:

1. Defendants "agreed not to compete and to keep out of commerce and trade millions of newspapers."

2. This is a per se violation of Section 1 of the Sherman Act.

3. The alleged violation of the antitrust laws is not excused by the claim of the existence of a "labor dispute."

4. The plaintiffs have a proper standing to sue.

5. Injunctive relief is appropriate because irreparable injury will otherwise result.

The defendants resist this application on the following grounds:

1. The Norris-LaGuardia Act and Section 20 of the Clayton Act prohibit the injunction sought.

2. Equitable principles require that the injunction be denied.

### I.

HAVE PLAINTIFFS SHOWN A LIKELIHOOD OF SUCCESS IN CHALLENGING THE AGREEMENT AS A VIOLATION OF THE ANTITRUST LAWS

Title 15 U.S.C. § 1 in its essential part is as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *."

It is well to note that this agreement (1) does not fix prices; (2) does not allocate territorially the sale or distribution of newspapers; (3) does not preclude the establishment of competing journals in the New York area; (4) does not provide any discrimination between the would-be purchasers of any newspapers; (5) involves no control of advertising. In short, it has not the attributes of monopoly.

There is no doubt that under certain circumstances newspapers may become engaged in activities constituting trade or commerce relating to interstate economy sufficient to fall under the wide sweep of the Sherman Act. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 602, 73 S.Ct. 872, 97 L.Ed. 1277 (note 11) (1953); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S. Ct. 181, 96 L.Ed. 162 (1951); Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356 (1934); United States v. Bitz, 2 Cir., 1960, 282 F.2d 465; Evening News Pub. Co. v. Allied Newspaper Carriers, 3 Cir., 1959, 263 F.2d 715, cert. denied 360 U.S. 929, 79 S.Ct. 1449, 3 L. Ed.2d 1544; Kansas City Star Company v. United States, 8 Cir., 1957, 240 F.2d 643, cert. denied 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438; Interborough News Co. v. Curtis Publishing Co., 2 Cir., 1955, 225 F.2d 289. Associations which gather and distribute news are also vulnerable. Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L. Ed. 2013 (1945).

However, the acts of the newspapers accused must fall within the confines of the Act. Counsel for the plaintiffs have pointed to no decision holding that the alleged agreement falls into this category. The court has discovered none.

Indeed, the basic and principal effect of the alleged agreement for the nonstruck papers to cease when their competitors are struck, is to attempt to maintain a bargaining position with the union. It is to counter a "whipsaw" strike.

There is at least some doubt as to whether the agreement complained of is in restraint of trade or commerce among the several states. See Blumenstock Bros. Advertising Agency v. Curtis Pub. Co., 252 U.S. 436, 40 S.Ct. 385, 64 L.Ed. 649 (1920). The reason plaintiffs are affected is not that trade or commerce among the several states is restrained, but because the economic pressure of employers against employees affects their employment.

■ There is some authority for the assertion that persons incidentally injured by a conspiracy cannot sue. A conspiracy may have many purposes and objects. However, in order to state a cause of action under the anti-trust laws, a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry, otherwise he is not injured "by reason" of anything forbidden in the anti-trust laws. Conference of Studio Unions v. Loew's Inc., 9 Cir., 1951, 193 F. 2d 51, 54, cert. denied 342 U.S. 919, 72 S. Ct. 367, 96 L.Ed. 687 (1952). See also Schatte v. International Alliance of Theatrical Stage Employees, 9 Cir., 182 F.2d 158, 167, cert. denied 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608 (1950). Compare Roseland v. Phister Mfg. Co., 7 Cir., 1942, 125 F.2d 417, 139 A.L.R. 1013; Klein v. Sales Builders Inc., N.D.Ill.1951, Trade Cases 62,600.

The general rules as to requirements for this type of action have been stated as follows:

"In order to support the action it is necessary to show that defendant's acts come within the condemnation of the statute and that plaintiff's business or property has been injured thereby. Plaintiff must show actual pecuniary damages and a direct injury to himself, aside from the injury common to the general public; * * *. Plaintiff cannot found his cause of action on the basis of violations resulting in injuries to persons other than himself. * *

"The injuries forming the basis of the action must be the direct, probable, and proximate result of the unlawful acts complained of; and if there is no causal relation between the injury and the statutory transgression, or if the relation is indirect, remote, and consequential, there can be no recovery. The injury must result from the tendency of the acts complained of to lessen competition or to create monopoly." 58 C.J.S. Monopolies § 95, pp. 1113–1115, and cases therein cited.

I am forced to conclude that there is at least a substantial doubt rather than a determinative conclusion that the agreement attacked is a violation of the Sherman Act.

II.

AGREEMENTS SUCH AS THIS HAVE BEEN HELD NOT TO CONSTITUTE UNFAIR LABOR PRACICES; THIS VERY AGREEMENT HAS ALSO BEEN HELD NOT TO CONSTITUTE AN UNFAIR LABOR PRACTICE.

The decision in N. L. R. B. v. Truck Drivers Local Union No. 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957),[2] known as the "Buffalo Linen Case," appears to expressly uphold the conduct hereof which plaintiffs complain—at least to the extent of determining that this action of defendants did not constitute an unfair labor practice.

The opinion of Mr. Justice Brennan sets forth the nature of the Employers Association and the collective bargaining between the Union and the Association on a multi-employer basis; the Union's use of a "whipsawing" plan by striking one of the employers; and the resultant layoff of union members by the remaining

2. Reversing Truck Drivers Local Union No. 449 v. N. L. R. B., 2 Cir., 1956, 231 F.2d 110.

seven employer members of the Employers Association. Mr. Justice Brennan then wrote:

"Although, as the Court of Appeals correctly noted, there is no express provision in the law either prohibiting or authorizing the lockout, the Act does not make the lockout unlawful *per se*. Legislative history of the Wagner Act, 49 Stat. 449, indicates that there was no intent to prohibit strikes or lockouts as such. The unqualified use of the term 'lock-out' in several sections of the Taft-Hartley Act is statutory recognition that there are circumstances in which employers may lawfully resort to the lockout as an economic weapon. This conclusion is supported by the legislative history of the Act.

"We are not concerned here with the cases in which the lockout has been held unlawful because designed to frustrate organizational efforts, to destroy or undermine bargaining representation, or to evade the duty to bargain. Nor are we called upon to define the limits of the legitimate use of the lockout. The narrow question to be decided is whether a temporary lockout may lawfully be used as a defense to a union strike tactic which threatens the destruction of the employers' interest in bargaining on a group basis." (353 U.S. pp. 92–93, 77 S.Ct. 645–646)

The determinative answer to the question was stated by Mr. Justice Brennan as follows:

" * * * Multi-employer bargaining long antedated the Wagner Act, both in industries like the garment industry, characterized by numerous employers of small work forces, and in industries like longshoring and building construction, where workers change employers from day to day or week to week. This basis of bargaining has had its greatest expansion since enactment of the Wagner Act because employers have sought through group bargaining to match increased union strength. Approximately four million employees are now governed by collective bargaining agreements signed by unions with thousands of employer associations. At the time of the debates on the Taft-Hartley amendments, proposals were made to limit or outlaw multi-employer bargaining. These proposals failed of enactment. They were met with a storm of protest that their adoption would tend to weaken and not strengthen the process of collective bargaining and would conflict with the national labor policy of promoting industrial peace through effective collective bargaining.

"The debates over the proposals demonstrate that Congress refused to interfere with such bargaining because there was cogent evidence that in many industries the multi-employer bargaining basis was a vital factor in the effectuation of the national policy of promoting labor peace through strengthened collective bargaining. The inaction of Congress with respect to multi-employer bargaining cannot be said to indicate an intention to leave the resolution of this problem to future legislation. Rather, the compelling conclusion is that Congress intended 'that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future.'

"Although the Act protects the right of the employees to strike in support of their demands, this protection is not so absolute as to deny self-help by employers when legitimate interest of employees and employers collide. Conflict may arise, for example, between the right to strike and the interest of small employers in preserving multi-employer bargaining as a means of bargaining on an equal basis with a large union and avoiding the com-

petitive disadvantages resulting from nonuniform contractual terms. The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." (pp. 94–96, 77 S.Ct. 646–647)

See also N. L. R. B. v. Continental Baking Co., 8 Cir., 1955, 221 F.2d 427; N. L. R. B. v. Spalding Avery Lumber Co., 8 Cir., 1955, 220 F.2d 673; American Brake Shoe Co. v. N. L. R. B., 7 Cir., 1957, 244 F.2d 489.

The specific agreement complained of here was challenged before the National Labor Relations Board. It was upheld (139 N.L.R.B. No. 107) under date of November 21, 1962. Here the Board, contrary to the Trial Examiner, dismissed the complaint in its entirety, stating:

"In these circumstances, we cannot say on balance that Respondents' suspension agreement, limited as it was to contract violations, and, as the record shows, selectively and carefully applied, exceeded permissible bounds of defensive conduct. Accordingly, we find that the maintenance and use by Respondents of this agreement during the period here in question did not violate Section 8 (a) (1) and (3) of the Act. * * "

After discussing the nature of the operation of the "suspension agreement," the opinion states:

"In reality, the suspension agreement was intended to discourage, and did discourage, not Section 7 activities, but rather the series of unauthorized work stoppages which experience had shown to pose a continuing threat to the publishers. Thus, the agreement was, in essence, not an offensive weapon utilized by the Respondents to punish or lessen the legitimate effectiveness of the unions, but rather a defensive measure utilized to combat unauthorized work stoppages in the plants of the publishers involved, and, in the long run, in the entire unit." (p. 7)

The opinion further states, citing the Buffalo Linen case, supra:

"In making our judgment in this case, we are mindful particularly of the multiemployer nature of both the threat and the counteraction taken. In bargaining with the Association on a multiemployer basis, the craft unions obviously reaped certain benefits, but they also, we believe, necessarily subjected themselves to unit-wide response, in the event of problems involving the entire unit. * * * " (p. 8)

In a somewhat similar situation, described in Morand Bros. Beverage Co. v. N. L. R. B., 7 Cir., 1951, 190 F.2d 576, 582, Lindley, Circuit Judge, wrote:

" * * * Old Rose, of course, had a clear right to replace its striking employees. National Labor Relations Board v. Mackay Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381. The other petitioners, we believe, could quite properly and realistically view the strike, as they did, as a strike which, though tactically against but one petitioner, was, in the strategic sense, a strike against the entire membership of their Associations, aimed at compelling all of them ultimately to accept the contract terms demanded by the Union. It follows that they had a right to counter the strike's effectiveness by laying off, suspending or locking out their salesmen, who were members of the striking Union and as to whom there was not then in effect any collective bargaining agreement. We so hold, not merely on the basis of the implied recognition, in the 1947 Amendment to the Act, Section 8(d) (4), of the existence of such a right, but because the lockout should be recognized for what it actually is, i. e., the employer's means of exerting economic pressure on the union, a corollary of the union's right to strike. Consequently, once petitioners had exhausted the possibilities of

good faith collective bargaining with the Union through their Associations, any or all of them were free to exercise their right to lock out their salesmen without waiting for a strike, just as the Union was free to call a strike against any or all of them."

### III.

### THIS CASE INVOLVES A LABOR DISPUTE AND IN A LABOR DISPUTE THE RELIEF SOUGHT IS PROHIBITED

 Section 113(a) of Title 29 U.S.C. appears to govern in deciding whether a case involves or grows out of a labor dispute.

Section 113(a) is as follows:

"§ 113. Definitions of terms and words used in chapter

"When used in this chapter, and for the purposes of this chapter—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or association of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section)."

Here, there is no doubt that the Typographical Union struck four of the publisher defendants and the remaining non-struck publisher defendants ceased operations in order to avoid "whipsawing" tactics. Neither can there be any question that this is a case " * * * between employer and employees, * * * involving, or growing out of, a dispute *concerning terms or conditions of employment * * * "* as those terms are used in Section 20 of the Clayton Act, 29 U.S.C. § 52. See N. L. R. B. v. Truck Drivers Local Union No. 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957) (the Buffalo Linen case).

A labor dispute exists in the case of a controversy over wages. N. L. R. B. v. Indiana Desk Co., 7 Cir., 1945, 149 F.2d 987. A "lockout" has been held a "labor dispute" under an analogous statute. Nelson v. Texas Employment Commission, Tex.Civ.App., 290 S.W.2d 708.

### IN A LABOR DISPUTE THE RELIEF SOUGHT IS PROHIBITED

Section 20 of the Clayton Act (29 U.S.C. § 52) and the Norris-LaGuardia Act (29 U.S.C. §§ 53, 104, 113) apply to injunctions sought against employers as well as to injunctions sought against employees or labor unions. The legislative history of the Norris-LaGuardia Act confirms this interpretation. The Report of the Senate Committee on the Judiciary (S.Rep.No. 163, 72nd Cong., 1st Sess. (1932), p. 19) makes this clear:

"Moreover it will be observed that this section (§ 6), as do most all of the other prohibitive sections of the bill, applies both to organizations of labor and organizations of capital. The same rule throughout the bill, wherever it is applicable, applies both to employers and employees, and also to organizations of employers and employees."

Clayton Act § 20 proscribes injunctions which prohibit employers " * * * from ceasing * * * to employ any party to such [labor] dispute." As the real relief sought by plaintiffs by the preliminary injunction for which they have applied is an order compelling defendants or certain of them to resume publication and thus put plaintiffs back

to work, the injunction they seek clearly falls within this prohibition.

Clayton Act § 20 also forbids injunctions which prohibit employers from "withholding from, any person engaged in such [labor] dispute, any strike benefits or *other moneys or things of value* \* \* \*." (Emphasis added)

Section 4(a), (b) and (c) of the Norris-LaGuardia Act (29 U.S.C. § 104(a), (b) and (c)) provides as follows:

"§ 104. Enumeration of specific acts not subject to restraining orders or injunctions

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

"(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

"(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

"(c) Paying or giving to or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value."

Section 5 of the Norris-LaGuardia Act (29 U.S.C. § 105) is as follows:

"§ 105. Doing in concert of certain acts as constituting unlawful combination or conspiracy subjecting person to injunctive remedies

"No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title."

It is therefore, by reason of statutes at least, doubtful that plaintiffs have the right to secure the relief sought.

## IV.

## INTERRUPTION OF COMMERCE ARISING OUT OF A BONA FIDE LABOR DISPUTE DOES NOT WARRANT INJUNCTION UNDER THE SHERMAN ACT.

█ United States v. San Francisco Electrical Cont. Ass'n, D.C.N.D.Calif. 1944, 57 F.Supp. 57; Milk Wagon Drivers Union v. Lake Valley Farm Products Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940). See also United Leather Workers' International Union v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104 (1924); Industrial Ass'n of San Francisco v. United States, 268 U.S. 64, 82, 45 S.Ct. 403, 69 L.Ed. 849 (1925).

In San Francisco Electrical Cont. Ass'n, supra, Judge Yankwich wrote as follows:

"Workmen have the right to organize.

"Employers may combine for the mutual protection of their interests. Employers and employees may bargain collectively. They may, in so doing, or in enforcing their demands, by strikes, lockouts, restrictions on the use of men or equipment, affect the flow of goods in interstate commerce.

"But all the late decisions agree that, in the light of the Clayton (29 U.S.C.A. § 52) and the Norris-LaGuardia (29 U.S.C.A. §§ 101–115) Acts, such results are not the direct interference with interstate commerce which the Sherman Anti-Trust Act forbids. See: New Negro

Alliance et al. v. Sanitary Grocery Co., 1938, 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; United States v. Hutcheson et al., 1940, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Milk Wagon Drivers' Union v. Lake Valley Farms Products, Inc., 1940, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; United States v. Building, etc., Council, 1941, 313 U. S. 539, 61 S.Ct. 839, 85 L.Ed. 1508; United States v. United Brotherhood, etc., 1941, 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508; Blankenship v. Kurfman, 7 Cir., 1938, 96 F.2d 450; Wilson & Co. v. Birl, 3 Cir., 1939, 105 F. 2d 948; United States v. American Federation of Musicians, D.C.Ill. 1942, 47 F.Supp. 304, affirmed by memorandum, 1943, 318 U.S. 741, 63 S.Ct. 665, 87 L.Ed. 1120; United States v. Bay Area Painters, etc., Joint Committee, D.C.N.D.Cal., 1943, 49 F.Supp. 733, per St. Sure, J." (57 F.Supp. pp. 60–61)

In Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122 (1940), the plaintiffs, "who sought the injunction, were four: one was the Chicago local of a C.I.O. union, the Amalgamated Dairy Workers; two were Chicago dairies whose milk was processed and distributed by members of the C.I.O. union; the fourth was a Wisconsin coöperative association which supplied milk to the plaintiff dairies. Defendants were the Chicago local of the A.F. of L. Milk Wagon Drivers' Union, and, its officials. The defendant union is a craft organization, limiting its membership to milk wagon drivers; the plaintiff union is organized along industrial lines, and its membership consists of all kinds of dairy workers, including inside help, office workers, wagon drivers, helpers, sweepers and janitors." (311 U.S. pp. 93–94, 61 S.Ct. p. 123) The Supreme Court, by Mr. Justice Black, in reversing the grant of an injunction stated:

"Whether or not one agrees with the committees that cited cases constituted an unduly restricted interpretation of the Clayton Act, one must agree that the committees and the Congress made abundantly clear their intention that what they regarded as the misinterpretation of the Clayton Act should not be repeated in the construction of the Norris-LaGuardia Act. For us to hold, in the face of this legislation, that the federal court have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the Act and would reverse the declared purpose of Congress. * *" (p. 103, 61 S.Ct. p. 128)

In United Leather Workers v. Herkert, supra, Chief Justice Taft declared:

"* * * the mere reduction in the supply of an article to be shipped in interstate commerce, by the illegal or tortious prevention of its manufacture, is ordinarily in indirect and remote obstruction to that commerce. It is only when the intent or necessary effect upon such commerce in the article is to enable those preventing the manufacture to monopolize the supply, control its price or discriminate as between its would-be purchasers, that the unlawful interference with its manufacture can be said directly to burden interstate commerce.

* * * * * *

"We concur with the dissenting Judge in the Circuit Court of Appeals when, in speaking of the conclusion of the majority, he said: 'The natural, logical and inevitable result will be that every strike in any industry or even in any single factory will be within the Sherman Act and subject to federal jurisdiction provided any appreciable amount of its product enters into interstate commerce.' (284 Fed. 446, 464.)

"We can not think that Congress intended any such result in the enactment of the Anti-Trust Act or

that the decisions of this Court warrant such construction." (pp. 471–472, 44 S.Ct. p. 627)

As to intent, the court in Scott Publishing Co. v. Columbia Basin Publishers, Inc., D.C.W.D.Wash.1959, 180 F.Supp. 754, 769, aff'd 9 Cir., 1961, 293 F.2d 15, enunciated this rule:

" * * * If an actual restraint of trade results from a combination, or if monopoly is achieved by an individual acting alone or in combination with others, the intent is immaterial, or may be inferred. United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333; United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Griffith, 334 U.S. 100, 68 S. Ct. 941, 92 L.Ed. 1236; United States v. Columbia Steel Co., 334 U. S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. However, where no restraint of trade or monopoly results from the acts and conduct complained of, then the acts or conduct complained of must be accompanied by a specific intent to restrain trade or monopolize before there is a violation of Sections 1 or 2. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L. Ed. 518; United States v. Columbia Steel Co., supra, 334 U.S. at page 525, 68 S.Ct. at page 1123."

Although Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) involved a protracted "sit-down" strike by workers, the court, speaking through Mr. Justice Stone, stated: " * * the Sherman Act admittedly does not condemn all combinations and conspiracies which interrupt interstate transportation." (p. 486, 60 S.Ct. p. 988)

### V.

### EQUITABLE PRINCIPLES PRECLUDE THIS RELIEF

Notwithstanding the foregoing reasons, the injunctive relief must still be denied on solely equitable principles.

The plaintiffs' chief and perhaps only complaint is that the newspapers are not being published, and that they are thus denied employment opportunities. Since the claim is primarily for loss of wages, no irreparable loss of a character to invoke injunctive relief exists. Damages would provide sufficient relief if the plaintiffs are successful at the trial.

The granting of such injunctive relief would require the defendants to publish the papers now not struck by the unions and to thus forego a defensive tactic which has been approved as proper and not as an unfair labor practice.

It is elementary that a preliminary injunction is designed to preserve the subject in controversy in its then-existing condition. It is also equally well known that courts are more reluctant to grant a mandatory injunction than a prohibitory one and that generally an injunction will not lie except in prohibitory form. Such mandatory injunctions, however, are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.

In view of the fact that:

(1) The plaintiffs have not shown a likelihood of success in challenging the agreement as a violation of the anti-trust laws;

(2) The controversy arises from a labor dispute in which the courts lack jurisdiction to issue injunctions;

(3) Irreparable harm has not been shown and damages appear as an adequate remedy,

the plaintiffs' motion for a preliminary injunction is denied.

The foregoing shall constitute my Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

Settle order on notice.