**AUTOMATIC RADIO MFG. CO., Inc.**
and
**Automatic Radio Sales, Inc., Plaintiffs,**
v.
**FORD MOTOR COMPANY, Defendant.**
Civ. A. No. 63–387.

United States District Court
D. Massachusetts.

Sept. 20, 1967.

Roger P. Stokey, Walter B. Comegys, Jr., Walter F. Henneberry, Boston, Mass., Worth Rowley, Washington, D. C., for plaintiff.

Claude R. Branch, John M. Hall, Conrad W. Oberdorfer, James C. Heigham, Thayer Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., for defendant.

MEMORANDUM AND ORDER ON AUTOMATIC RADIO'S MOTION FOR PRELIMINARY INJUNCTION

September 20, 1967

GARRITY, District Judge.

This matter came on for hearing before the court upon plaintiff's motion for a preliminary injunction pursuant to 15 U.S.C. § 26. The plaintiff seeks an order enjoining defendant Ford Motor Company from refusing to supply to its dealers automobiles without factory-installed radios which are identical to automobiles delivered with them, i. e., having identical dashboards but with an empty compartment or hole where the radio is ordinarily installed. There is presently pending before the court an antitrust action between the parties, instituted on April 26, 1963. A motion by the defendant for summary judgment was denied by Judge Caffrey on May 28, 1964. Automatic Radio Manufacturing Co. v. Ford Motor Company, D.Mass., 1964, 35 F.R.D. 198. A prior motion by the plaintiffs for a preliminary injunction was denied by Judge Caffrey on June 28, 1965. Automatic Radio Manufacturing Co. v. Ford Motor Company, D.Mass., 1965, 242 F.Supp. 852. On February 17, 1967, plaintiffs filed this motion for a preliminary injunction. Considerable discovery was made by the parties in preparation for the hearing. Voluminous affidavits and briefs were submitted.

Although the history and facts of this case are described in detail in Judge Caffrey's opinions, they bear some repetition and additional description now. Plaintiff Automatic Radio Manufacturing Co., Inc., manufactures custom automobile radios sold by its affiliate, plaintiff Automatic Radio Sales, Inc., through its distributors to automobile dealers throughout the nation, including dealers who sell automobiles manufactured by defendant. A custom automobile radio is one that is designed and adapted for installation in a particular model of automobile. Defendant manufactures custom automobile radios for installation in its automobiles either at the factory or by its dealers. The radios manufactured and sold by plaintiffs for installation in defendant's automobiles are practically indistinguishable in appearance, after installation in automobiles, from radios manufactured by defendant.

For many years, when an automobile manufactured by defendant or by another manufacturer was delivered to a dealer without a radio installed at the factory, the opening in the instrument panel designed to accommodate a radio was covered by a small piece of metal called a "knockout plate." If a dealer wished to install a radio manufactured either by the automobile manufacturer or by plaintiff, he could easily remove the "knockout plate" and install the radio in the bared opening. However, in some of its 1965 models first appearing in the fall of 1964, the defendant placed a plastic cover about 27″ wide over the entire instrument panel with holes in it for various dashboard gauges and instruments and, if a radio had been factory-installed, for the dial, pushbuttons and knobs for the radio. For cars without factory-installed radios, the plastic dashboard cover was identical except that it had

no holes for a radio. If a dealer wished to install a radio, the entire dashboard cover would have to be removed and replaced by one with holes in it for radio knobs and pushbuttons in addition to the holes for the other instruments, i. e., a dashboard cover identical to the type used at the factory for a car equipped with a factory-installed radio.[1] Dashboard covers with holes for radios in them have been called "perforated" and those without holes for radios "imperforate."

The custom radios which both parties supply to dealers for installation in defendant's automobiles are sold in "kits" containing all necessary parts. When instrument panels of defendant's automobiles were manufactured with "knockout plates" and for those models of defendant's automobiles that still are, the kits contain essentially a radio, an antenna and various small attachment parts. However, for automobiles delivered to dealers with imperforate dashboard covers, the radio installation kit must also contain a perforated cover. The defendant has added one to its radio installation kit without having raised the price of the kit to the dealer.

Plaintiffs owe a great part of their success to the fact that they sell their radios to automobile dealers for a considerably lower price, about $10 less, than radios sold by automobile manufacturers. If plaintiffs are to continue to compete with defendant, they now must also supply perforated dashboard covers with their radio installation kits. Since defendant did not increase the price of its kit when it added a perforated dashboard, plaintiffs must absorb most, if not all, of their added cost of a perforated dashboard cover if they are to retain their competitively lower price. Plaintiffs allege that because of this added cost they are now losing money on radio installation kits sold to dealers of defendant's cars. But the problems allegedly facing plaintiffs are not confined to

cost. Plaintiffs allege that because of the difficulties in retooling, securing the necessary materials and manufacturing these dashboard covers, they are unable to supply them to dealers until a number of months after the beginning of the automobile model year. Plaintiffs thereby lose a great amount of business and also allegedly incur great damage to their goodwill and reputation as suppliers of a "complete line" of custom automobile radios for new cars. Finally, plaintiffs allege that they are completely excluded from supplying radio installation kits for some of defendant's models, such as the 1967 Mercury and Deluxe Comet, because they are unable to secure the materials necessary to manufacture the appropriate dashboard.

Plaintiffs allege that defendant's practice of selling to its dealers an automobile equipped with a perforated dashboard only when the dealer orders a radio installed in that automobile at the factory constitutes "tied selling" in violation of both Section 1 of the Sherman Act and Section 3 of the Clayton Act and monopolization of trade in violation of Section 2 of the Sherman Act. Plaintiffs have now moved for a preliminary injunction enjoining defendant from refusing to deliver to its dealers automobiles with perforated dashboards but without radios installed at the factory. The form of injunction proposed by the plaintiffs would require the defendant to change its regular vehicle ordering system by modifying its forms so that provision is made for the regular ordering of automobiles with perforated dashboards but without radios. As matters now stand there is no space, or line or box to be checked on the order forms regularly used by the defendant's dealers for ordering delivery of a car so equipped. To this the defendant responds that its dealers have never ordered or inquired about delivery of an automobile with a perforated dashboard but without a radio; that such an order, if received, would be

---

1. Theoretically it is possible for a dealer to punch or saw holes for a radio in an imperforate plastic dashboard cover.

But this the court finds not to be practicable. The appearance of the whole is apt to be marred or the plastic broken.

treated as a special order which might or might not be filled. Moreover, the defendant says, delivery of cars to dealers in such an unfinished condition would detract from their saleability. If driven at night in such a condition, they would be unsafe because light would shine from behind the dashboard obscuring parts of the instrument panel. Dealers sometimes order substantial quantities of cars for inventory, especially soon after the new models come out, without knowing whether or not customers will wish radios to be installed, thus enhancing the possibility that unfinished cars might get into the hands of customers.

The defendant has raised numerous legal objections, including that (a) its practice does not constitute a tying arrangement, (b) it is unlikely that plaintiffs will prevail on the merits, (c) plaintiffs have failed to prove the danger of immediate and irreparable damage, and (d) plaintiffs have "unclean hands." [2]

█ Plaintiffs insist that their present motion is "in sharp contrast" to the one denied by Judge Caffrey in 1965 and therefore the court is not now bound by his decision as the "law of the case." The court agrees with plaintiffs' legal conclusion but not with the stated premise. The doctrine of the "law of the case" is inapplicable because the prior denial of an injunction was interlocutory and discretionary, United States v. United States Smelting Co., 1950, 339 U.S. 186, 198–199, 70 S.Ct. 537, 94 L.Ed. 750, Dictograph Products Co. v. Sonotone Corp., 2 Cir., 1956, 230 F.2d 131, 134–

136, and the situation has changed in several respects, Securities and Exchange Commission v. Graye, S.D.N.Y., 1957, 156 F.Supp. 544, 546, Reiter v. Universal Marion Corp., D.C., 1959, 173 F.Supp. 13, 15–16. The facts differ from those in 1965 in that the defendant's use of dashboard covers has been extended to other models, plaintiffs' losses have mounted and one of the three competitors of the defendant in 1965, Soundex Radio Corporation, went into bankruptcy in 1966 and its former sales director blames it principally on the defendant's conduct of which the plaintiffs here complain. Also since 1965, the record of the case has been greatly enlarged by pretrial discovery. The law, too, has developed, e. g., the fact that a franchising program had been unilaterally conceived by the manufacturer did not shield it from § 1 of the Sherman Act, or even help it much in defending against an alleged violation. United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 18 L.Ed.2d 1249. The relief sought by the plaintiffs is also different. In 1965 they sought to bar the defendant from delivering any cars to dealers with imperforate dashboards. They do not seek such an order now. For present purposes they concede the right of the defendant to send dealers automobiles with imperforate dashboards except when a dealer has ordered a car with a perforated dashboard but without a radio. In that event, say the plaintiffs, the defendant should be compelled to ship what the dealer has ordered. Also unlike their motion in 1965,

**2.** The court does not reach the issue of "unclean hands," but notes in passing that the vitality of the defense may be greater in proceedings under 15 U.S.C. § 26 than under 15 U.S.C. § 15. Graham v. Triangle Publications, Inc., E.D.Pa., 1964, 233 F.Supp. 825, 831–832. The court also notes that while the parties are competing for the many millions of dollars spent each year for custom radios for defendant's automobiles, this competition appears to be almost completely hidden from the consuming public. Plaintiffs appear to make every effort to supply dealers with radios as indistinguishable in appearance as possible from those manufactured by defendant, with the result that a radio made by the plaintiffs may be installed at the same retail price without the consumer knowing or having any reason to inquire by whom it was manufactured. Regardless of whether plaintiffs are deliberately striving to deceive the public, they provide a great temptation to defendant's dealers to increase their profits by passing off plaintiffs' radios as those manufactured by defendant, particularly if the consuming public has not been alerted by either party to the potential confusion.

748

the plaintiffs now seek an order compelling the defendant to print up and put in use new order forms, as explained.

■ But the basic problem remains, the same, namely, whether the defendant's discontinuance of simple knockout plates in favor of fancy, plastic dashboard covers is equivalent to a tying arrangement proscribed by the statutes. The answer will involve an exercise in semantics. Some of the governing principles are clear:

> "For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. (fn. 4) Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."

Northern Pac. R. Co. v. United States, 1958, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. And it is undisputed that the defendant sells automobiles without radios and radios without automobiles. One difficulty lies in determining the defendant's "product." The plaintiffs' view is that when the defendant delivers a car with a factory-installed radio, it is delivering two "products," one a custom radio and the other an automobile with holes in the dashboard cover which have been plugged up or filled by radio parts. The plaintiffs argue that the defendant should be compelled to supply that holey product separately should a dealer place an order for one. The defendant's position is that an automobile with empty holes in the dashboard is not a product, but an unfinished, partially assembled machine which it has never offered to sell in that condition. The defendant asserts that dashboard styling and finish are not frills, but important and essential components of an automobile in today's style-minded market. The parties have cited no precedent on this point and the court knows of none. The court does, however, reject the suggestion of the defendant that the plaintiffs' situation is indistinguishable from that of sellers of bumpers, hang-on fender lights, outside auto trunks and luggage racks which were in vogue decades ago. Their goods became parts of automobiles and lost their identities as accessories. Radios have retained their identity as separate products.

■ On the issue whether the plaintiffs have shown "that the danger of irreparable loss or damage is immediate," 15 U.S.C. § 26, the plaintiffs have presented an anomalous case. They have shown greater losses on sales to defendant's dealers than had been incurred at the time of the 1965 hearing, but presented virtually no proof to connect these losses with conduct of the defendant. Plaintiffs contended in 1965 that dealers bought fewer radios from plaintiffs because the time required by a mechanic to remove a dashboard cover and install a plaintiffs' radio was considerably greater than formerly when knockout plates were used. Judge Caffrey found to the contrary and the plaintiffs have not now challenged that finding. In response to defendant's interrogatories filed in March 1967, plaintiffs listed 25 dealers who had allegedly declined to buy radios from plaintiffs because of the dashboard change complained of. Only one of them, a dealer named Chuhinko, mentioned increased installation time as a reason for reducing his purchases from the plaintiffs and he described it as being "a minor factor." The plaintiffs' cost of furnishing a perforated dashboard cover with its radio for a 1967 Ford is $4.50 compared with $1.46 for a 1966 Ford and $1.87 for a 1965 Ford. A major factor in the cost per unit is the cost of tooling and building assembly lines. That part of the cost per unit would be cut in half if sales should double. It would serve no purpose to duplicate the detailed findings contained in Judge Caffrey's opinion. Suffice it to say that in every particular they were corroborated by voluminous evidence of events since 1965. The court finds that plaintiffs have thus far failed

to establish a causal relationship between the dashboard change and plaintiffs' declining sales.[3] The court finds that the chief reason for the decline is probably the current shortage of trained mechanics and service stalls and dealers' consequent preference for factory-installed equipment.

On the same issue of irreparable and immediate damage, the over-all business of the plaintiffs is prospering. While they have lost some distributors during the past two years, they have replaced them and added new ones so that the total number of their distributors has increased. The plaintiffs have not shown that, if they ultimately prevail,[4] it will not be possible or will be extraordinarily difficult to compensate them adequately in money damages for whatever losses of sales and goodwill they may have suffered by reason of defendant's conduct. Foundry Services v. Beneflux Corp., 2 Cir., 1953, 206 F.2d 214, 216; Gerber Products Co. v. Beech-Nut Life Savers, S.D.N.Y., 1958, 160 F.Supp. 916, 921, 923.

The nature of the specific relief sought by the plaintiffs also militates against granting their motion. As contrasted with their position in 1965, when they sought to block delivery by the defendant to its dealers of all Ford and Fairlane cars equipped with imperforate dashboard covers, they now seek to bar delivery of such a car only if delivered pursuant to an order for a car with a perforated dashboard but without a radio installed in it. In view of the defendant's evidence that it has never received orders for automobiles so equipped, nor even an inquiry about their availability, the court's order if granted might prove nugatory. Moreover, supervision of the defendant's compliance might present untold difficulties, considering the number of Ford dealers, approximately 7,200, and the many options involved in ordering a new car and accessories. Difficulty of enforcement may itself constitute a sufficient reason for denying injunctive relief. See Note, "Developments in the Law—Injunctions," 78 Harv.L.Rev. 994 at 1012 (1965). Finally, a preliminary injunction requiring the defendant to print up and use new order forms would be mandatory in character. Such injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." Clune v. Publishers' Association of New York City, S.D.N.Y., 1963, 214 F.Supp. 520, 531.

The court concludes that the plaintiffs have not made a sufficient showing to support issuance of the preliminary injunction sought. In particular, the plaintiffs have not established by evidence offered on the pending motion (a) that the defendant's marketing practice of supplying imperforate dashboards unless radios have been factory-installed is equivalent to an illegal tying arrangement, this being an unresolved question which must be more fully developed both factually and legally at the trial; (b) that the defendant's practice has caused irreparable damage to the plaintiffs or threatens immediately to do so; and (c) that the form of relief sought would be efficacious and appropriate under the circumstances. The plaintiffs' renewed motion for a preliminary injunction is denied.

---

3. Plaintiffs' sales of custom radios to dealers selling General Motors and Chrysler Corporation automobiles, which continue to be equipped with "knockout plates," have decreased considerably in recent years too.

4. The present posture of these proceedings does not support very strongly either the preliminary aspect of the injunction or the immediacy of the alleged danger of irreparable loss or damage to plaintiff's business. The suit was instituted in 1963 and it is expected that discovery will have been completed and the trial will commence within a year.