**REFRIGERATION ENGINEERING CORPORATION, Plaintiff,**

v.

**FRICK COMPANY, Defendant.**

**Civ. A. No. SA–73–CA–273.**

United States District Court, W. D. Texas, San Antonio Division.

Jan. 24, 1974.

---

Brice A. Tondre, San Antonio, Tex., for plaintiff.

Charles R. Gregg and John D. Roady, Houston, Tex., A. W. Worthy, San Antonio, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

JOHN H. WOOD, Jr., District Judge.

On August 15, 1973, Defendant, Frick Company ("Frick") notified Plaintiff, Refrigeration Engineering Corp. ("RECO"), by letter, that, effective ninety (90) days from receipt, RECO was terminated as a Frick factor. On or about October 30, 1973, this action was filed by RECO, invoking jurisdiction under 15 U.S.C. § 26, and seeking a preliminary and permanent injunction prohibiting Frick from cancelling its Factor Contract or, alternatively, prohibiting Frick from charging RECO higher prices than other customers for Frick products. In its Complaint, and the Motion for Preliminary Injunction filed contemporaneously, RECO alleged certain violations of the Federal antitrust laws in restraint of interstate commerce, including exclusive dealing, tying, and price discrimination. Frick responded timely to the Complaint and Motion, denying any such violations, and Plaintiff's right to injunctive relief, and both parties filed three sets of Briefs and Supporting Affidavits.

The preliminary injunction hearing was held on November 26, 1973, and on December 19, 1973, the Court entered its Order denying the preliminary injunction.

## FACTUAL BACKGROUND

The Court is of the opinion that the credible and competent evidence shows the following: Plaintiff, RECO, is in the business of manufacturing, installing,

and servicing refrigeration systems, primarily for the food processing industry. It is fifth or sixth largest of fifty-seven factors in the Frick marketing program. While its area of primary responsibility is defined in its Factor Contract as certain counties in southeast Texas, RECO bids jobs and competes with other factors throughout the United States. RECO has been a Frick factor since 1960. Frick factors are, essentially, distributors, who purchase components from various manufacturers, including Frick, and integrate these items into larger refrigeration systems which they sell to end users. In return for a discount on purchases, all factors are required by the Factor Contracts to use their best efforts to promote Frick products, to maintain an inventory of Frick parts for supply to customers who require repair and replacement, and to render other distributive functions. RECO is unique among Frick factors, in that it manufactures a number of the components (including freezing tunnels, pressure vessels and screw compressor packages) of the systems which it sells, and imports others (high speed reciprocating and rotary screw compressors). These facts allow RECO to sell its integrated refrigeration systems for substantially less than other Frick factors; and, having these sources of less expensive items, RECO has demonstrated no willingness to promote the corresponding Frick products.

The business and operations of RECO have expanded significantly in the past several years—gross income growing from approximately $2.2 million for the twelve month period ending April 30, 1968, to $3.8 million for the twelve month period ending April 30, 1973. The purchase by RECO of Frick products (equipment and parts) has developed in inverse proportion to this income growth—moving from $694,242 in 1966 to an intervening high of $838,424 in 1970, to $430,381 in the first ten months of 1973. In dollar volume, Frick supplies between fifteen and twenty percent of the products sold by RECO.

Frick is a major domestic manufacturer of refrigeration equipment, including compressors of various types (rotary, screw, heavy duty industrial and multi-cylinder reciprocating), condensors, ice-makers, pressure vessels, freezing tunnels and related items of equipment and assorted replacement parts. Instead of performing its own distribution, Frick has employed independent factors in its marketing system for a number of years. In return for the required promotional efforts on behalf of Frick products and other functions set forth in the Factor Contract, these factors are allowed to purchase parts and equipment from Frick at 51% of list. Frick sells parts to *non-factors* at approximately 70% of list and sells equipment to non-factors at approximately 56.25% of list. Non-factors may purchase from Frick factors at whatever price is negotiated by them. The factors are given geographic areas of primary responsibility but are free to sell to any customer anywhere within the United States.

The Contract whose termination is the subject of this suit was executed on December 1, 1969. Neither that Factor Contract, nor *any* Factor Contract issued by Frick requires that a factor deal only in Frick products, or that a factor purchase certain Frick products if it expects to purchase any other Frick product. No Frick factor has been denied the right to purchase products competitive with those of Frick and no factor is purchasing, or is being compelled to purchase, only Frick products. Similarly, no Frick factor is purchasing or is being compelled to purchase any Frick product which it may not want in order to have the right to purchase another Frick product which it might desire. Each Factor Contract requires that the factor "use its best efforts to sell, install and service Frick products and equipment". Each Factor Contract allows termination without cause, and it can be assumed that RECO dealt with its customers, stocked its inventory, and designed its systems with full knowledge of

whatever insecurity that provision represents.

Late in 1971, RECO, disappointed with the performance of the "Eclipse" compressor then being manufactured by Frick, contracted with a Japanese manufacturer for a continuing supply of the screw type and the multi-cylinder reciprocating type compressors (Mycom compressors). Frick concedes that its Eclipse multi-cylinder compressor was at that time inferior in quality to other such compressors on the market. By early 1972, however, Frick had developed a compressor which it and its factors, and the industry as a whole, considered quite acceptable, and Frick urged RECO to test and, if satisfied, promote the newly developed Frick compressor. It was the failure and apparent unwillingness of RECO to promote and properly expose to the public this new compressor line which is largely responsible for the controversy resulting in Frick's termination of the Factor Contract, and this lawsuit. Mr. Norman Schoenfeld, newly appointed President of Frick, traveled to San Antonio, Texas, to inquire of Mr. Harper Martin, President of RECO, why RECO was ignoring the Frick compressor and to urge that RECO promote this and other Frick products. RECO continued to refuse to promote the new compressor, or any other Frick product which corresponded to those which were manufactured by RECO or imported by it. Unable to obtain the promotional efforts sought, Frick cancelled the Factor Contract in February of 1972. RECO asked for negotiations for the reinstitution of the Contract and numerous telephone conferences, meetings, and correspondence between the parties followed. The parties disagree in their interpretations of certain of these items of correspondence and various statements made by representatives of Frick—RECO claiming requirements of exclusivity and tying, and Frick denying that it at any time required RECO either to promote or to sell only Frick products, or that it at any time required RECO to buy any Frick product which it may not have wanted in order to obtain another Frick product which it did want.

The result of these negotiations was the withdrawal of the February cancellation, on several conditions, including RECO's agreement to evaluate and promote certain Frick products and RECO's agreement to dismiss a certain patent suit filed against Frick. The Court finds that such conditions did not include any requirement that RECO deal exclusively in any Frick product or tie the purchase of any desired product to the purchase of an unwanted product. It was then Frick's understanding that RECO was bound by a contract of at least two (and perhaps five) years' duration to buy Mycom compressors, and Frick did in fact accept co-existence with Mycom.

The relations between the parties continued to deteriorate throughout the balance of 1972 and the early part of 1973. Except for a single ad in an industry publication supporting the Frick Dyna/Metric (multi-cylinder reciprocating) compressor, RECO continued to ignore the majority of the Frick products in its promotional efforts. Frick continued to despair of adequate representation of its products in the geographic areas of responsibility given to RECO, and relations between the parties became more abrasive. Accordingly, as previously stated, on August 15, 1973, Frick again cancelled the Contract, effective on or about November 19, 1973, agreeing to continue to sell to RECO at non-discount prices. This suit followed.

## THE ISSUES

Plaintiff contends that Defendant has violated Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 3 of the Clayton Act (15 U.S.C. § 14) by agreements and economic coercion to obtain agreements constituting exclusive dealing and tying arrangements; that is, that the August 15, 1973, termination of the Factor Contract was motivated by RECO's failure to abide by Frick's alleged requirements, in violation of the

Federal antitrust laws, that RECO buy Frick products exclusively, and that RECO buy particular Frick products, which it may not want, in order to buy certain other Frick products which it did want. RECO further contends that if RECO is required to buy from Frick as a non-factor, at prices higher than those available to Frick factors, Frick will be guilty of price discrimination, in violation of the Robinson-Patman Act (15 U.S.C. § 13a). RECO seeks to enjoin the termination, and the threatened price discrimination.

In order to secure the preliminary injunction which it seeks, RECO *must show at least a probability of success* at a trial on the merits and an immediate danger of irreparable injury to Plaintiff. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2nd Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). The standard has been variously articulated in a line of cases cited in the recent Second Circuit holding in Charlie's Girls, Inc. v. Revlon, Inc., 483 F.2d 953 (2nd Cir. 1973). See also 7 J. Moore, Federal Practice, § 65.04 [1] at 65–39 (2nd ed. 1972). Plaintiff's burden herein is increased by the mandatory nature of the relief sought—that is, the reinstitution of the cancelled Factor Contract—and the facts and the law must therefor clearly favor RECO if it is to be granted its preliminary injunction. Exhibitors Poster Exchange Inc. v. National Screen Service Corporation, et al, 441 F.2d 560, 561 (5th Cir. 1971). Clune v. Publishers' Association of New York City, 214 F.Supp. 520, 531 (S.D.N.Y. 1963). This Court is mindful of the hazards of granting injunctive relief in a case such as this, requiring the parties to continue a deteriorated business relationship and directing, in effect, the operations of Defendant's business. Deltown Foods, Inc. v. Tropicana Products, Inc., 219 F.Supp. 887, 891 (S.D.N.Y. 1963); Warner & Co. v. Black & Decker Mfg. Co., 167 F.Supp. 860 (E.D.N.Y. 1958), and Robert L. Lotz et al v. Chrysler Corporation et al, 1973–2 Trade Cases, ¶ 74,771 (W.D.Mo. 9–15–73).

This Court finds that Plaintiff has shown no existing or threatened violation of the Federal antitrust laws, by reason of exclusive dealing, tying arrangements or threatened price discrimination, and is unlikely to prevail at a trial on the merits on these issues; nor has Plaintiff raised sufficiently serious questions relative to these issues as to make them, or any of them, fair grounds for litigation. Further, the Court finds that no immediate danger of irreparable harm exists to Plaintiff, who has an adequate remedy at law.

## EXCLUSIVE DEALING

In support of its claim that Frick attempted to coerce RECO to refrain from dealing in products of its, Frick's competitors, Plaintiff has focused on the multi-cylinder (high speed) reciprocating and screw compressors, now being imported by RECO, as those products which Frick insisted be bought only from it. Mr. Martin, President of RECO, however, admitted that RECO was not in fact buying such products, or any products, only from Frick, or had at any time relevant hereto bought exclusively from Frick. Mr. Martin on cross-examination, was unable to cite any statement, conduct, or writing which required exclusivity in RECO's purchases of Frick products.

Mr. Schoenfeld, President of Frick at the time the controversy with RECO arose, and now Chairman of its Board, stated that no Frick factor in 1972 or 1973 was dealing exclusively in Frick products; and Mr. Ballou, Marketing Vice-President of Frick, similarly testified by affidavit. Frick representatives testified that there was no provision in any Factor Contract requiring exclusive dealing and that, being aware of the problems that requiring exclusive dealing might cause under State and Federal antitrust laws, it was the express policy of the Company not to require exclusive dealing by any of its factors. Frick

was requiring only aggressive promotion of all its products and it was the failure of RECO to so diligently represent Frick which was the basis of Frick's dissatisfaction with RECO. The negotiations and correspondence between the parties are consistent with Frick's attempts to cause RECO to remedy such failure and do not reflect attempts to require that RECO sell only Frick products.

■ Considering the evidence as a whole, the Court finds no agreement or coercion to obtain an agreement of exclusive dealing, and finds further that the motivation for Frick's 1973 termination of the Factor Contract was RECO's failure to adequately promote all Frick products, as well as the friction and hostility which had developed in the business relations between the parties.

In addition to having found no exclusive dealing, this Court finds the Plaintiff has failed to establish that any such alleged activity might foreclose competition from a substantial portion of the market, as is required under Tampa Electric Company v. Nashville Coal Company, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed. 2d 580 (1961), to find any substantial lessening of competition in violation of Section 3 of the Clayton Act or unreasonable restraint of trade under Section 1 of the Sherman Act. In this connection, the Court is impressed by the large number of existing or potential distributors available as outlets for manufacturs of refrigeration equipment. Mr. Schoenfeld testified to having determined that twenty-nine (29) such distributors exist in San Antonio, Texas, alone, and literally thousands throughout the United States, and this testimony was not contradicted. It is difficult to perceive, therefore, how the foreclosure of RECO as one distributor—if that were the intent or effect of Frick's conduct—might substantially lessen competition.

Further, the Court is unable to find, based upon facts presented to it, that the relevant geographical market of RECO is other than nationwide, or that the product lines involved are restricted as alleged by RECO to less than general refrigeration systems. In oral testimony Mr. Martin emphasized the southeastern part of the United States as the relevant geographical trade area, and product lines identified with the poultry and shrimp markets. The determination of the relevant market is based upon the scope of effective competition, Tampa Electric Coal v. Nashville Coal Co., supra, and it is apparent from the evidence that RECO sells and competes with other distributors throughout the United States, and over a broad range of refrigeration systems. requirements. While Mr. Martin testified to the "reputation" of the company being restricted geographically and in certain lines of commerce, he testified by affidavit, and RECO's Briefs recited, that RECO did business "wherever it is able to secure a profitable job in the United States", and Mr. Martin described RECO's share of the market "for its level of the industrial refrigeration business" as five to ten percent. The Court finds that the more reliable market information is that presented by Mr. Ballou, by affidavit, to the effect that RECO's share of the various relevant product markets throughout the United States generally range from 1% to 2%, with two product markets approaching 4% and 5%.

## TYING ARRANGEMENTS

It is of course in the interest of RECO to attempt to establish a tying arrangement or coercion to force a tying arrangement in violation of the Sherman and Clayton Acts, for such a violation has been held under certain conditions to constitute a per se violation of these laws, not requiring a fact finding of substantial lessening of competition or unreasonable restraint of trade

■ Tying is the forcing of a purchaser to buy an unwanted item (the "tied" product) as a condition to its being supplied an item which it, the purchaser, *does* desire (the "tying" product). Northern Pacific Railway Company v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Times-

Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

▇▇▇ An unlawful tying arrangement requires a linkage of two distinct products both of which the seller is compelled to purchase. The United States Supreme Court, in Northern Pacific Railway Co. v. United States, supra, 356 U.S. at 6, fn. 4, 78 S.Ct. 514 has stated: "Of course where the buyer is free to take either product by itself there is no tying problem". The Court finds there was no such linkage in the case at Bar, as RECO was free to purchase any Frick product by itself without having to purchase any other Frick product. The Court considers it significant that no factor within the Frick distributive system, as testified by Mr. Schoenfeld, buys or is required to buy any Frick product which it does not want in order to secure the purchase of any product which it does want, and likewise RECO has never bought or been required to buy any product which it did not want in order to secure any product which it did want.

Plaintiff asserts that elements of tying are present in the termination letter of August 15, 1973. As the Court reads that correspondence, Frick's fundamental complaint is that RECO is ignoring the Frick tunnels, high speed reciprocating compressors and condensors in its promotional efforts and, as therein stated, RECO's "willingness to aggressively pursue" only the shell ice-maker and heavy duty compressors of Frick "is not enough to justify our continuing you as a factor". It is the absence of aggressive promotional pursuit by RECO of a broader range of Frick products, as required by the Factor Contract, that is the bone of contention. Frick is not requiring RECO to purchase any Frick product in order for RECO to be able to purchase some other product.

The Court finds that the attitude of Frick is best expressed in this excerpt from the letter of Mr. Schoenfeld to Mr. Waitz of March 10, 1972: "We (Frick)

do insist, however, that where a Frick product is available, it at least be enthusiastically submitted for the customer's consideration—for that is the essence of our having a factor represent us".

The authorities cited by Plaintiff are distinguishable. In Osborn v. Sinclair Refining Company, 286 F.2d 832 (4th Cir. 1961), fact findings were made that Sinclair actually required the purchase by Plaintiff of Goodyear tires, batteries and accessories (as the tied product), to the exclusion of those of competitors, as a condition for continuing to sell to the Plaintiff Sinclair gasoline under a lease by Sinclair of its service station property (as the tying products). This Court has found no such requirement or tying in the case at Bar.

Plaintiff's reliance upon Brandeis Machinery & Supply Corp. v. Barber-Greene Co., 1973 Trade Cases, ¶ 74,672, is similarly misplaced. In that case, the Defendant made it clear, and the Court so found, that Plaintiffs were not to represent directly competitive manufacturers, and Defendant refused to sell to the Plaintiffs the asphalt equipment manufactured by it unless the Plaintiffs purchased stone crushing equipment exclusively from Defendant. Such a refusal and tying requirement do not exist in the case before this Court.

▇▇▇ Plaintiff has not cited, and this Court has not found, any authority for the proposition that a manufacturer can not require its distributor to promote to customers all its products, so long as the purchase of one product of the manufacturer is not tied to the *purchase* of another of the manufacturer's products. As stated in McElhenney Co. v. Western Auto Supply Co., 167 F.Supp. 949, 954 (W.D.S.C.1959), affirmed, 269 F.2d 332 (4th Cir. 1959), "The anti-trust laws do not prohibit a manufacturer or distributor from selecting dealers who will devote their time and energies to selling the former's products and a manufacturer or distributor is not compelled to retain dealers having divided loyalties adverse to the interests of the said manu-

facturer or distributor". This is the prevailing law in the absence of an agreement compelling a distributor to refrain from selling a competitor's goods.

■ Plaintiff's contention that a Frick *trademark* is a tying product suffers from the same absence of proof that Frick at any time required the purchase by RECO of any of its products as a condition for permitting any claimed purchase of a trademark. Further, the Frick trademark is not separate from or sold separately from the Frick products, but is clearly identified with and an integral part of such products; and paragraph Thirteenth of the Factor Contract provides that the factor has no separate rights whatsoever in the Frick trademark, and may use it only with Frick's written consent. Such claim by RECO therefore fails to meet the test set forth in Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), requiring that *two separate identifiable products* must be involved in order for there to be tying. While lower courts have, in some recent cases, held that a trademark may be a separate product to which another product may be tied, these cases make it clear that only certain specific trademarks, of the "representation of product quality" type, may be separate products and therefore be involved in tying. Such trademarks are in fact separately marketable, and are sold by "rent-a-name" type franchisors. They are not simply "representation of product origin" type trademarks, which are not sold separately. The distinction is clearly set forth in Mid-America Icee, Inc. v. John E. Mitchell Co., 1973–2 Trade Cases, ¶ 74,681 (D.Or.1973).

■ Plaintiff claims, finally, that the Factor Contract, or the factor relationship, represents a tying product which Frick threatened to withhold, or withdraw, if Plaintiff did not purchase certain items from it. The Court does not consider that the factor relationship or Factor Contract may be regarded properly as a "product". The factor relationship is not sold or marketed separately, or, indeed, sold at all. In Warriner Hermetics, Inc. v. Copeland Refrigeration Corporation, 463 F.2d 1002 (5th Cir. 1972), cited by Plaintiff, a trademark, and not a contractual relationship, is presented as the tying product, the panel stating: "To this *trademark* Copeland has tied compressors rebuilt by authorized Copeland rebuilders and parts manufactured by Copeland" (emphasis supplied). Susser v. Carvel Corporation, 332 F.2d 505 (2nd Cir. 1964), and Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), relied on in the Warriner Hermetics case, likewise involve trademarks. The Court is impressed by the argument of Defendant that, to hold that a distributorship relationship is a tying product, to which is tied all products which a manufacturer desires a distributor to sell, would render all exclusive dealing arrangements per se illegal; that is, refusal to continue a distributorship by reason of failure to buy a manufacturer's products exclusively would become insupportable, without regard to the unreasonableness or anti-competitive effect of the exclusive dealing, in contravention of the clear dictates of the Sherman and Clayton Acts, and would similarly destroy the *Colgate* doctrine which permits termination of distributorship contracts as unilateral refusals to deal.

■ Not all tying arrangements are per se violations. A tying arrangement is presumed to be an unreasonable restraint of trade, and therefore illegal, ". . . whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected" Northern Pacific Railway Co. v. United States, supra, 356 U.S. at 6, 78 S.Ct. at 518; Albert H. Cayne Equip. Corp. v. Union Asbestos & Rubber Co., 220 F.Supp. 784 (S.D.N.Y.1963) and cases cited therein. Fortner Enterprises v. United States Steel Corp., supra, 89 S.Ct. at 1259 states that the "proper focus of concern" in determin-

ing a tying violation is whether the "seller has the power to raise prices, or impose other burdensome terms, such as a tie-in, with respect to any appreciable number of buyers within the market."

Regardless of the existence of any tying arrangement, Mr. Schoenfeld testified that none of the Frick products were particularly unique and all had adequate substitutes at comparable prices, and that this fact accounted for the low profit margin experienced by Frick in its product lines. Mr. Martin stated a preference for certain Frick products and described certain characteristics of others, but neither this nor the evidence as a whole shows a degree of dominance or uniqueness in any product claimed by RECO to be a tying product which would give Frick the economic power required to support a theory of tying.

In conclusion, and with regard to both the exclusive dealing and tying arrangement arguments, it is of course recognized that statements may have been made, orally and in writing, which were interpreted by the parties, then and now, quite differently. Mr. Waitz, general counsel for Plaintiff, testified, for example, that he was told by Mr. Schoenfeld, after the second termination, that there was no reason to discuss reinstatement unless "Harper Martin is going to stop handling Mycom". Even if such words were uttered (and Mr. Schoenfeld denies ever having made such a statement), they and other random comments which may have been made must be considered in light of the numerous other statements and comments made, and the total intention of Frick, as interpreted by this Court in judging the credibility of the witnesses, and reviewing the documentary evidence. The Court finds that there was no motivation or intention on the part of Frick to require either exclusive dealing or tying and finds the oral testimony of Mr. Schoenfeld, and the Affidavit of Mr. Ballou in this regard to be credible and convincing. There was therefore no violation of

Section 1 of the Sherman Act or Section 3 of the Clayton Act and thus no basis under the Federal antitrust laws for entering an injunction restoring the cancelled contractual relationship.

## PRICE DISCRIMINATION

Plaintiff further claims a threatened violation of the Robinson-Patman Act (15 U.S.C. § 13a), alleging admitted proposed price discrimination, the absence of any cost justification therefor, and injury to competition. RECO argues that price discrimination will occur if Frick charges RECO higher prices than Frick charges its factors, after termination of the Factor Contract. Frick stated in its termination letter of August 15, 1973, that it would continue to deal with RECO, but at those non-discount prices charged non-factors. Nevertheless, Mr. Schoenfeld testified that Frick will not willingly participate in a violation of the law and if the Court or Frick were to determine that a violation (e. g., of the Robinson-Patman Act) would occur if it sold to RECO at non-discount prices, it, Frick, would *not* sell further to RECO. There being no violations of the Federal antitrust laws, Frick is entitled to refuse to deal further with RECO following termination of the Factor Contract, United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The Court in any event finds that no price discrimination has been established concerning Frick's plans and intentions to sell to RECO at non-discount prices as a non-factor, and that therefore there is no threatened violation of the Robinson-Patman Act against which a temporary injunction should issue.

For an act of price discrimination to be violative of the Robinson-Patman Act, such act must occur between competitors in comparable transactions; that is, the persons receiving the different prices must be in actual functional competition with one another. F. T. C. v. Borden Co., 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966); Texas Gulf Sulphur Company v. J. R.

Simplot Company, 418 F.2d 793 (9th Cir. 1969); Tri-Valley Packing Association v. F. T. C., 329 F.2d 694 (9th Cir. 1964). Plaintiff has not met its burden of proof in this regard in that it has failed to adequately specify either competitors, products or comparable transactions in which such discrimination is likely to occur.

■ Even if threatened price differentials with regard to comparable transactions could be considered to have been proved, no violation of the Robinson-Patman Act occurs unless competitive injury is threatened, Texas Gulf Sulphur Company v. J. R. Simplot, supra. Further, cost justification is, by the terms of the Act, a defense to any claim of a Robinson-Patman violation.

■ The credible evidence establishes that those Frick factors to whom price discounts are granted perform promotional and other distributive services on behalf of all Frick products, thereby incurring expenses, saving Frick similar expenses, and warranting the discounts allowed them for the products. The evidence also shows that while RECO does in fact employ a labor force and engages in various promotional and other distributive activities, such efforts and expenses relating thereto are not on behalf of the Frick product line, and RECO has demonstrated its unwillingness to render such services for Frick. In addition, RECO manufactures certain components of its refrigeration systems and imports others, all at costs well below those paid by Frick factors for similar products, resulting in higher profits to RECO and what Mr. Martin describes as a "competitive edge" in its sales of the integrated systems. This cost advantage will, in the opinion of the Court, continue after termination, and allow RECO to remain fully competitive with those firms who will be granted the Frick discount.

The Court therefore finds no competitive injury and finds further that the discount granted by Frick to its factors, and denied to RECO, is cost justified.

**IRREPARABLE INJURY**

■ In addition to finding no probability of success at a trial on the merits of the various anti-trust issues, the Court finds no immediate danger of irreparable harm which is likely to be suffered by RECO if the preliminary injunction sought is denied. This is, in fact, a clear example of that type of case in which an adequate remedy at law exists, and this Court should therefore not utilize its equity powers to interfere. Any injury suffered by Plaintiff may be compensated by money damages which are readily ascertainable, and, accordingly, Plaintiff, having an adequate remedy at law, the preliminary injunction which it seeks should be denied. Further, specific enforcement of such a contract as is here involved should not be granted. The difficulties of forcing these parties to continue doing business with one another are obvious.

As a result of the termination of the factor relationship RECO 1) may continue to buy from Frick, but at the non-discount prices; or 2) by reason of Frick's refusal to sell to RECO, or otherwise, may buy the same or similar products from other sources, including other manufacturers and factors of Frick. In the event of either of these alternatives, damages which might possibly be suffered by RECO by reason of having to pay higher prices for Frick products are readily calculable.

■ At the preliminary injunction hearing a hypothetical maximum loss of approximately $8,000.00 per month was calculated, based upon Plaintiff having to pay full prices for Frick products and parts, at a purchase level comparable to that of the preceding twelve (12) month period, but without considering savings to RECO by virtue of its not having to perform as a Frick factor, and other possible cost savings. Such a loss can be absorbed by Defendant pending a trial on the merits without undue hardship, in light of the general financial strength of Defendant and the cash flow reflected by exhibits submitted by it. This loss figure was used by counsel

for Frick to dramatize the absence of irreparable injury and presumes, for that purpose, that Plaintiff will have to pay the highest price, for Frick products, that any non-factor must pay. Frick has not conceded that RECO will suffer any loss. In reality, as Mr. Schoenfeld testified, RECO may buy from other factors at prices below those charged by Frick, and the Court has found that substitutes exist for substantially all Frick products, and most parts, at lower or comparable prices, so that RECO may turn to non-Frick sources, including its own manufacturing plant, for similar products without financial loss.

RECO can prevent any loss of good will by continuing to sell at prices which are acceptable to its customers, with the expectation of compensation if any loss occurs in the event it prevails at a trial on the merits. The Court does not accept the contention of RECO that its losing the designation of "Frick factor" will necessarily result in business being diverted from it. Indeed, the testimony of Mr. Martin would lead one to believe that RECO's customer relations are such that they will follow his recommendations with respect to service and equipment, having complete confidence in his expertise and ability to provide for them quality products at fair prices. In any event, Mr. Martin testified, and RECO has repeatedly stated in its Briefs filed herein, that RECO regards the Factor Contract of little value, other than as a means of obtaining Frick's products cheaply.

A word should be said regarding the injury which may be suffered by *Frick* if this preliminary injunction is in fact granted. Mr. Schoenfeld testified, and the Court accepts as true, that Frick is now being denied fair representation of its products within the area of primary responsibility assigned to RECO. A continuation of this lack of representation, or promotion, denies certain profits to Frick, as well as the opportunity to generate good will which may result in future sales. Further, Frick is allowing

discounts to RECO, and therefore denying income to itself, for services which are not being performed by RECO. The morale of the other Frick factors can be expected to be affected as they view RECO continuing to receive a discount as a Frick factor while acting contrary to the Factor Contract in failing to use its best promotional efforts on behalf of all Frick products. Any balancing of the hardships to be suffered by the parties does not, therefore, tip in favor of RECO, and it in fact appears that significant harm may come to Frick if a preliminary injunction were to issue.

The Court further finds that the public interest will be served by the termination of the present factor relationship between Frick and RECO. As a result of the termination, the products of Frick will find an outlet or outlets to the public not previously available to it, and on a basis which will not impair the availability of the products of competitors to the public. The public will thereby be furnished increased exposure to a product line to which it has previously had little or no access through RECO, and economic competition between manufacturers of these products will therefore be enhanced.

### CONCLUSION

■ In the judgment of this Court the termination of RECO as a factor has been prompted by purely business considerations, having to do with the quality of the relationship and the promotion of Frick products by RECO, and without any trade-restraining requirements in violation of the Federal antitrust laws imposed upon RECO. RECO was in violation of its "best efforts" obligation under the Factor Contract. Certainly, as stated in Ricchetti v. Meister Brau, Inc., 431 F.2d 1211, 1214 (9th Cir. 1970), a manufacturer has an interest in the quality of his distributors and, if dissatisfied, can seek a more aggressive outlet for his products, thereby enhancing competition rather than retarding it. Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918 (9th

Cir. 1968), cert. den., 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654, and Jos. E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, ltd., 416 F.2d 71 (9th Cir. 1969), cert. den., 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, reh. den., 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415. The Court is likewise impressed by the difficulty of enforcement of any preliminary injunction which might be entered in this case, and difficulty of enforcement is, in itself, often a sufficient reason for denying injunctive relief, Automatic Radio Mfg. Co., Inc. v. Ford Motor Company, 272 F.Supp. 744 (D.Mass. 1967), and Note, "Developments in the Law—Injunctions," 78 Harvard L.Rev. 994 at 1012 (1965). The Court should not be called upon to weld together two business entities which have shown a propensity for disagreement, friction, and even adverse litigation. The remedy in damages available to RECO is sufficient, and is by far more appropriate than the preliminary injunction here sought.

Viewing the evidence as a whole, and having considered the statements or remarks and items of correspondence to which various interpretations have been attached, this Court finds that Frick has neither committed nor threatened any violation of the antitrust laws, that there is no reasonable probability of success by Plaintiff on the merits as to its allegations of such violations, and that, in fact, Plaintiff has raised no serious questions in this regard so as to make these allegations a fair ground for litigation. Whatever the nature of the conduct of the affairs of the parties, relating both to the 1972 termination, the intervening negotiations, and the 1973 termination, Frick was lacking an anticompetitive intent or motive in connection therewith, and its conduct constituted no substantial lessening of competition or unreasonable restraint of trade so as to bring it within the prohibitions of the Sherman or Clayton Acts. Similarly, Plaintiff has established no threatened price discrimination in violation of the Robinson-Patman Act. For the above reasons,

and for the further reason that Plaintiff has failed to show any immediate danger of irreparable harm, or a balancing of the equities tipping in its favor, the preliminary injunction sought herein by RECO is denied.

The clerk will file this Memorandum Opinion and Order and furnish copies to counsel, for all parties.